**UNITED STATES of America,**

**v.**

**John THOMPSON, a/k/a "Mo Mo," Defendant.**

**No. Crim.A. 98–10332–NG.**

United States District Court,
D. Massachusetts.

Nov. 8, 1999.

Joan M. Griffin, Casner & Edwards, Boston, MA, for John Thompson aka Momo, defendant.

Theodore B. Heinrich, U.S. Attorney, Boston, MA, for U.S.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

The Sentencing Guidelines permit a departure from the proscribed sentencing range when the Court finds "extraordinary" family obligations or an "extraordinary" employment record. The question raised by this case is what these concepts mean. What is the standard by which to judge "extraordinary" family obligations or an "extraordinary" work history? What class of defendants define "ordinary"? While the Sentencing Commission and the case law offer little guidance on the subject, one thing is clear: The baseline is not, nor should it be, "Ozzie and Harriet," the fictional two parent, two child, suburban home. In a sentencing regime whose aim is to eliminate unwarranted disparities between similarly situated offenders, "ordinary" should be determined by comparing this defendant with others convicted of the same crime.

Here, I compared the defendant, who was convicted of crack cocaine sales, with others convicted of the same offense in my Court, and indeed, throughout the District of Massachusetts. I reviewed not only my own records of previous sentences, but also presentence reports of individuals sentenced by other judges within the District.

John Thompson ("Thompson") pleaded guilty to one count of Distribution of Cocaine Base in violation of 21 U.S.C. § 841(a)(1).[1] Pursuant to U.S.S.G. § 2D1.1(c)(4), his base offense level was 32.[2] While he had a strong family and employment background, and a minimal criminal record (Criminal History Category I, the lowest level), he was facing a significant prison term under the Sentencing Guidelines and the statutory mandatory minimum (pursuant to 21 U.S.C. § 841(b)(1)(B)(iii)).[3]

The Guideline range for Thompson was driven entirely by the quantity of drugs involved (51.8 grams), and the fact that the drug at issue was crack cocaine, rather than powder cocaine. Indeed, the roughly seven to nine year Guideline range for this offense (87–108 months) was even higher than the five year mandatory minimum sentence.[4] And, while it has no significance for this analysis, it is worth noting that for the identical quantity of powder cocaine, the range would be twelve to eigh-

1. 21 U.S.C. § 841(a)(1) provides that it is unlawful for any person knowingly or intentionally "to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Thompson pleaded guilty to Count 5 of the Indictment which involved the sale of 23.6 grams of cocaine base to an undercover police officer.

2. U.S.S.G. § 2D1.1(c)(4) provides a base offense level of 32 if the offense of conviction involved at least 50 grams but less than 150 grams of cocaine base. Although Thompson pleaded to one count of distribution involving 23.6 grams of cocaine base, U.S.S.G. § 1B1.3(a)(2) provides that a defendant can be held accountable for all acts that "were part of the same course of conduct or common scheme or plan as the offense of conviction." Therefore, in calculating Thompson's

base offense level, the government used the aggregate of four sales made to undercover agents for a total of 51.8 grams. The first sale on January 13, 1997, involved 5.9 grams. The second sale on January 16, 1997, involved 11.6 grams. The third sale on January 21, 1997, involved 10.7 grams. The fourth sale on February 11, 1997, involved 13.6 grams. The defendant agreed to these amounts and dates.

3. 21 U.S.C. § 841(b)(1)(B)(iii) provides a mandatory minimum of not less than five years if the offense involved 5 grams or more of a mixture or substance which contains cocaine base.

4. This range was calculated based on an Offense Level of 32, minus 3 points for acceptance of responsibility.

teen months.[5] *See generally United States v. Canales*, 91 F.3d 363 (2nd Cir. 1996) (District Court had no authority to depart downward under 18 U.S.C. § 3553(b) based on sentencing disparity in § 2D1.1 between offenses involving crack and non-crack cocaine, notwithstanding Sentencing Commission's 1995 report which proposed replacing 100–to–1 penalty ratio with parity for offenses).

The government recommended a sentence of 87 months, the low end of the Guideline range. Thompson moved for a downward departure to the five year mandatory minimum, based on his family ties and responsibilities, his strong employment record, and the totality of the circumstances, including his age, minimal criminal history, and extraordinary rehabilitation. *See e.g.*, U.S.S.G. § 5H1.5 (employment history); U.S.S.G. § 5H1.6 (family ties and responsibilities). The government opposed, taking the position that nothing about Thompson's family ties, employment responsibilities or circumstances met the Guidelines' standard of "extraordinary."

In order to determine what an "extraordinary" family tie or employment situation was, I had to decide what defined an "ordinary" family tie and employment situation. And in order to decide what an "ordinary" family tie was, I had to decide what the baseline was, the sample from which the "ordinary" portrait may be derived.

The Supreme Court in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) acknowledged the vagueness of these concepts and admonished courts to make departure decisions on a case-by-case basis, drawing on their day-to-day experiences. At the sentencing of Thompson, I did just that, concluding that based on my experience, the numerous crack cocaine convictions passing

through my Court, his case was indeed extraordinary. But I wanted to go further and address the question in a more systematic way. Accordingly, I reviewed the presentence ("PSR") reports of twelve individuals who were convicted for crack-cocaine sales as part of the same sweep of the Bromley Heath projects that led to Thompson's arrest—the same charge, the same location, at or near the same time. In addition, using as a reference point the universe of defendants sentenced for crack cocaine offenses in this Court during 1998 and 1999, comprising roughly the period from Thompson's arrest to his sentence, I evaluated the presentence reports of fifty-four individuals sentenced in the District of·Massachusetts.

I held two days of hearings, reviewed all of the supporting materials—including letters from Thompson's employer, various family members, members of the church that Thompson attended regularly, as well as Thompson's own statements about his life and the decisions he has made. I determined that the departure was appropriate and imposed the following sentence: sixty months incarceration, four years supervised release, no fine, and a special assessment of $100.00. Furthermore, I recommended that Thompson be incarcerated at Fort Devens which is close to his family and where he would be able to participate in an intensive 500 hour drug treatment program.

## I.  BACKGROUND

Thompson is a 24 year old African–American male who has resided in the Bromley Heath housing development his entire life. ˙ He had only one prior conviction and has never been incarcerated. His record reflected few encounters with law enforcement of any sort.[6]

---

5.  This range was calculated based on an Offense Level of 13; starting with base level 16, minus 3 for acceptance of responsibility. Pursuant to 21 U.S.C. § 841, 50 grams of cocaine does not require a mandatory minimum.

6.  Thompson's criminal record included the following: 1) possession of class D and B controlled substance in September 1993—one charge was dismissed and the other two were continued without a finding and then dismissed in December of 1997; 2) assault and

Thompson had a strong and steady employment record. His presentence report notes that he began working the moment that he learned of his fiancée's first pregnancy and has supported the family financially since then. In fact, her pregnancy precipitated his departure from high school. He wanted to behave in a responsible manner vis-a-vis his fiancée, and his new daughter.[7] He now has two daughters, Jabria (age 4) and Johnaiya (age 1).

He worked to become a member of Local Union 223 · as a union construction worker, and has been consistently employed by the union in various jobs. His most recent assignment was at M. Solberg Enterprises doing general construction work. His employer provided the Court with a strong letter in support of bail indicating that Thompson's return to work as a union contractor was both welcome and eagerly awaited. Between the time of his release on bail, and the sentencing, Thompson worked for M. Solberg without incident.

Prior to his union jobs, Thompson worked at New England Telephone earning $21.50 an hour, Peabody Construction Company at $21.50 an hour, and a landscaping job earning $19.50 an hour. According to the PSR, Thompson left past jobs because of lay offs, not performance problems.

At the time of the instant arrest, Thompson reported that he was earning $2,000 a month, with which he was supporting his fiancée and his daughters. In addition, he was making a financial contribution to his fiancée's mother and grandmother. Probation's investigation, as well as the myriad letters from friends, support this picture.

Thompson's fiancée, Breii Murray ("Murray"), the mother of his children, has a certificate in Business Administration from Roxbury Community College. Murray and her mother Jessica Gonzalez ("Gonzales") submitted letters describing the central role Thompson plays for them, and for Thompson's children. Both gave detailed descriptions of Thompson's intense emotional involvement with his daughters.

Additionally, Murray, Gonzales, and Murray's aunt, Ethel Ejiofor ("Ejiofor"), reported that they relied on Thompson on a daily basis. He took his daughter Jabria to and from school every day, which enabled Murray to work part-time. Ejiofor, who is 80 years old and has difficulty walking, relied on Thompson to perform household chores and errands, including taking her to church every Sunday. (Thompson also provided Ejiofor with financial assistance.) It was the input from Ejiofor and Gonzalez, together with the supporting letters from Thompson's employer, that led to Thompson's release pending trial, one of the few from the Bromley Heath sweep. Gonzalez describes Thompson as a "sweet man and a good father" whom she "loves like a son." [8]

battery in 1996 which resulted in a guilty finding and a 6 month probation term ending in December 1997; 3) drinking alcohol in public in April 1997, which was dismissed; 4) possession with intent to distribute a Class B substance which was filed without a change of plea on July 15, 1999. (The latter charge was brought shortly after the events that form the basis of this prosecution).

Thompson received one criminal history point for the assault and battery in 1996. The incident was a dispute between him and his fiancée which was characterized by Thompson and his fiancée as a "misunderstanding" which has since been resolved. While it is not uncommon for the accused in a domestic dispute to make that claim, the record of

Thompson's relationship with his fiancée, Breii Murray ("Murray"), both before and after this incident, supports their characterization. Murray and her mother both submitted letters to the Court documenting their support for Thompson as "kind, loving and trustworthy," and the "backbone" of his family, and urging leniency.

7. Thompson has tried to get his GED but stopped taking the courses because he was having difficulty balancing the classes with work.

8. So close was their relationship that Gonzalez offered to be a third party custodian for the defendant prior to his release on bail.

Ejiofor likewise reports she considers him to be a member of their family. Significantly, members of Thompson's immediate family and this extended family attended the sentencing hearings.

After his April 2, 1999, release on bail, Thompson continued to support Ejiofor and his own family, both economically and emotionally. Although Thompson could not reside at his fiancée's house, and had a steady and demanding job, he saw his children every single day.[9] They often spent the night with him at Ejiofor's house. He continued to take his daughters to school every day and pick them up at the end of the day.[10]

In his remarks to the Court and in his statements to Probation, Thompson noted that he was determined to be a real father to his children since his own father had been absent in his life. Each time his father was incarcerated, Thompson took care of his three younger siblings and helped his mother with chores. The letters submitted by counsel, as well as Probation's investigation confirm the strength of those efforts. Long before his arrest, Thompson was an exemplary father and fiancée.[11]

Thompson's incarceration will have a profound impact on his own family, his daughters and his fiancée. Murray may have to stop working so that she can better care for the children. Thompson's absence has already had a deleterious impact on his two girls. In addition, it will even have an impact on Murray's extended family, who have come to rely on him and love him.

## II. LEGAL ANALYSIS

### A. Family Ties

#### 1. The Guideline[12]

Chapter 5, Part H of the Guidelines lists seven specific offender characteristics which the Sentencing Commission has deemed "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range."[13] These factors include, *inter alia,* age, employment record, and family ties and responsibilities. Beyond this general language, however, the Guidelines provide minimal guidance. There is no commentary. There are no application notes, or even examples. A general state-

---

9. Thompson could not reside with Gonzalez and Murray because of the terms of their lease. While out on bail pending sentencing, Thompson resided with Ejiofor, Murray's aunt, and Murray's grandmother. Ejiofor owns her own home.

10. While on bond, Thompson regularly attended church and bible study classes. He received numerous certificates regarding his participation in religious activities while detained on these charges. In addition to providing an escort for his fiancée's mother and aunt at church every Sunday, he was active at the church throughout the week.

11. The government underscored the fact that one crack transaction occurred when Jabria was in the car with Thompson. The defense contests this version of the facts. Thompson, they maintain, had no intention of dealing crack in the presence of his daughter. The drugs were thrown into his car by others when the police were spotted. This episode was not part of the four which the defendant had agreed occurred.

12. The policy statement in U.S.S.G. § 5H1.6 states only that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range" and that "[f]amily responsibilities that are complied with may be relevant to the determination of the amount of restitution or fine." U.S.S.G. § 5H1.6, p.s. The original version of the Guidelines allowed for consideration of family circumstances in connection with the length and conditions of supervision. Language deleted by a 1991 amendment stated: "Where the guidelines provide probation as an option, these factors may be relevant in this determination. If a defendant is sentenced to probation or supervised release, family ties and responsibilities that are met may be relevant in the determination of the length and conditions of supervision." U.S.S.G., App.C.Amend. 386 (deletion effective November 1, 1991).

13. U.S.S.G. Ch. 5, Pt. H, intro. comment.

ment in the commentary to Chapter 5, Part H purports to clarify the concepts: "[F]actors that are not ordinarily relevant to the determination of whether a sentence should be outside the applicable Guideline range ... may be relevant to this determination in *exceptional* cases." Ch. 5, Pt. H, intro. comment. (Italics supplied.) The commentary then refers the reader to Section 5K2.0 which states:

> [a]n offender characteristic or other circumstance that is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range may be relevant to this determination if such characteristic or circumstance is present *to an unusual degree* and distinguishes the case from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing. (Italics supplied.)

U.S.S.G. § 5K2.0, p.s. (Italics supplied.)

Finally, in the Guidelines' introduction is the comment: "When a court finds an *atypical* case, one to which a particular guideline linguistically applies but *where conduct significantly differs from the norm*, the court may consider whether a departure is warranted." U.S.S.G. Ch. I, Pt. A, intro. comment. (4)(b). (Italics supplied.)

Piecing these policy statements together, the most that can be said is this: Family obligations may be relevant if these obligations are present to an "unusual degree," if the facts differ "significantly" from "the norm," taking the case out of the "heartland," suggesting that the case is "exceptional" or "atypical."

But these terms—heartland, typical vs. exceptional, conduct significantly different from the norm—raise more questions. What is the baseline for "ordinary" or "typical?" "Ordinary" or "typical" with regard to what kinds of factors? For example, am I simply identifying which family circumstances justify a departure on the theory that an exceptional family man or woman is somehow less culpable than one who ignores his family responsibilities? Or should I focus on the impact of incarceration on the extended family and whether that impact is somehow exceptional or atypical?

## 2. *The Case Law*

The case law, for the most part, restates, without defining, the ordinary/extraordinary standard. Focusing principally on the "not ordinarily relevant" language in Section 5H1.6, and the reference to "exceptional case" in the commentary for Chapter 5, Part H, for example, the Second Circuit has concluded that "[t]he clear implication of § 5H1.6 is that if the court finds the circumstances related to family ties and responsibilities are extraordinary, it is not precluded as a matter of law from taking them into account in making a downward departure." *United States v. Sharpsteen*, 913 F.2d 59, 63 (2nd Cir.1990). In *United States v. Johnson*, the court went further: " § 5H1.6's phrasing confirms the Commission's understanding that ordinary family circumstances do not justify departure, but extraordinary family circumstances may." 964 F.2d 124, 129 (2nd Cir.1992).

Likewise, the First Circuit has adopted the Second Circuit's "extraordinary family circumstances" standard. *See United States v. Rivera*, 994 F.2d 942, 948, 953 (1st Cir.1993) (reversal of District Court's decision not to depart for extraordinary family responsibilities because District Court failed to recognize it had the power to do so); *United States v. Chestna*, 962 F.2d 103, 106 (1st Cir.1992) (status as a single mother of three young children is not an unusual family circumstance); *but see United States v. Handy*, 752 F.Supp. 561, 561–562 (E.D.N.Y.1990) (departure warranted for mother of three, "reared in poverty in an urban environment which is a socioeconomic minefield through which she threaded her way and emerged unscathed, relatively speaking."); *United*

*States v. Pena–Tejeda,* 1999 WL 436481, *2 (S.D.N.Y.) (departure to mandatory minimum of 60 months from Guideline range of 70 to 87 months because earlier incarceration had severed all family ties and left wife living in abject poverty).[14]

Other judges have noted how difficult it is to narrow these terms into workable guidelines. Judge Weinstein observed that "[i]f an ordinary family consists of two responsible adults caring for one or more minor children, then few defendants have ordinary families ... Given the multiplicity of family arrangements in New York City, the use of the term 'ordinary' in the Guidelines gives the judge little guidance." Jack B. Weinstein, *The Effect of Sentencing on Women, Men, the Family, and the Community,* 5 Colum J. Gender & L. 169, 169 (1996). Similarly, when the District of Columbia Court of Appeals denied a departure for a drug courier because of the needs of her children, Judge Wald characterized the ordinary/extraordinary distinction in a scathing dissent:

> In reviewing section 5H1.6 departures, courts are asked (mistakenly, I believe) to undertake a 'mission impossible' of identifying where the ephemeral line between 'ordinary' and 'extraordinary' lies in the tragic realm of family breakup and the disruption of children's lives.

*United States v. Dyce,* 91 F.3d 1462, 1473 (D.C.Cir.1996) (Wald, J., dissenting).

Identifying extraordinary family circumstances, in short, reminds me of Justice Stewart's approach to obscenity: "I know it when I see it." *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart J. concurring).

Even if there was a baseline for "extraordinary," it is still unclear whether the analysis should focus on the impact on the defendant's family, the family relationship in and of itself, or both. Courts have followed all paths. *See United States v. Sclamo,* 997 F.2d 970, 971 (1st Cir.1993) (combination of extraordinary relationship and exceptional risk of harm to 12 year old step-son who had attention deficit hyperactivity disorder permitted departure); *United States v. Johnson,* 964 F.2d 124, 128–130 (2nd Cir.1992) (sole responsibility for raising four young children was basis for departure); *but see United States v. Shoupe,* 929 F.2d 116, 121 (3rd Cir.1991) (fact that defendant was a good father who regularly provided child support was not sufficient to show extraordinary family ties). *See also United States v. Canoy,* 38 F.3d 893, 907 (7th Cir.1994) (the standard is whether the "period of incarceration set by the Guidelines would have an effect on the family or family members beyond the disruption to the family and parental relationships that would be present in the usual case.").

*Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), offers an explanation why no one has expressly defined these concepts—no court, not the Sentencing Commission. Rather than defining "extraordinary" or "unusual," the Supreme Court identifies a methodology. As is usual in a common law tradition, and as is especially applicable to sentencing, the Court found that the standards defining "ordinary/extraordinary" " typical/exceptional" should evolve from the court's "day-to-day" experience in criminal sentencing. *See id.* at 82, 116 S.Ct. 2035. While the Guidelines provide uniformity, predictability and detachment, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the punish-

---

14. It is curious that courts have found both single parent families "typical" as well as nuclear families. The outcome may be explained by the group on which one focuses. The Bureau of Census statistics show that "just over 55% of white kids live in [nuclear] families, compared with about 26% of black kids and about 35% of Hispanic kids." *United States v. Rose,* 885 F.Supp. 62, 64 (E.D.N.Y.1995) (citing Bureau of the Census, U.S. Dept. of Commerce). Characteristics of the Black Population tbl. 7 at 36.

ment to ensue." 518 U.S. at 113. Since no "single set of guidelines" could encompass "the vast range of human conduct potentially relevant to the sentencing decision." U.S.S.G., Guidelines Manual, Ch. 1, Pt. A, pp. 1, 2 (1991), it still falls to the trial court to carve out the rules on a case by case basis.

I have done just that. First, I have drawn on my own experience as a judge. In addition, I have reviewed the presentence reports for offenders similarly situated to Thompson with respect to place (the Bromley Heath projects), time (1998), and offense (sale of crack cocaine), and more generally, I have reviewed the PSR's of those convicted of crack cocaine sales in this jurisdiction in 1998 and 1999.

### B. *Employment History*

#### 1. *The Guideline*

The Guidelines policy statement for employment obligations follows the same format as that for family ties.[15] Like family ties, employment history is a discouraged factor for departure unless it is "extraordinary." *See supra* note 10. Here again the Guidelines fail to provide any further guidance through application notes or otherwise.

#### 2. *Case Law*

Again, the circuits are not consistent in their holdings as to what is a sufficiently

extraordinary employment record warranting departure. For example, the defendant in *United States v. Big Crow*, 898 F.2d 1326, 1331–1332 (8th Cir.1990) had a seven year employment history as a forest aide and fire fighter on an Indian reservation where the unemployment rate was 72%. *See* 898 F.2d at 1332. Big Crow's job allowed him to provide adequately for his family: His employer was eager for him to return once his legal troubles were resolved. *See id.* The court's stated reasons for the departure included the defendant's "excellent employment history, solid community ties [,] consistent efforts to lead a decent life in [the] difficult environment [of the reservation]," and lack of prior criminal history, which reasons the Eighth Circuit endorsed. *See id.* at 1331–32.[16] The First Circuit, however, held that a defendant who had been running his own company for the last ten years yielding a significant salary of $30,000 annually was not one with an extraordinary record warranting departure. *See United States v. Rushby*, 936 F.2d 41, 41 (1st Cir.1991).[17] Significantly, however, the First Circuit's decision in *Rushby* predated *Koon.*

In any event, neither case answered the question—what defines the norm, the "ordinary," the "typical?"

#### C. *Application*

I compared Thompson to other crack cocaine defendants convicted in 1998 and

---

**15.** Policy statement § 5H1.5 states, "Employment record is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. Employment record may be relevant in determining the conditions of probation or supervised release."

**16.** In *United States v. Weise*, 89 F.3d 502, 506 (8th Cir.1996), the Eighth Circuit stated further that one of the distinguishing features of the defendant in *Big Crow* was his ability to work, and maintain a strong family, in the context of the difficult environment of the reservation. The fact that the defendant described how he had personally experienced and then overcame these hardships was telling. *See id.*

**17.** Rushby appealed the district court's failure to depart because he believed it failed to recognize that it had the power to do so. The First Circuit, however, did not address that claim. It decided, apparently applying a de novo standard, that whether or not the District Court believed it had the power to depart was irrelevant because Rushby's employment did not qualify as "extraordinary."

*Koon* instructed appeals courts to review departure decisions on an abuse of discretion standard, recognizing that the sentencing court "must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." *Koon*, 518 U.S. at 98, 116 S.Ct. 2035.

1999 for which presentence reports were available,[18] sentenced by any judge in the District of Massachusetts. I chose to define which defendants were "similarly situated" with reference to the offense of conviction. I made that choice because it was the intent of the Guidelines to eliminate unwarranted disparities for offenders charged with similar offenses. Specifically, I compared Thompson's experiences and accomplishments with two pools of defendants. First, I reviewed the PSR's of other individuals who were convicted of distribution of crack cocaine in the Bromley Heath development at the time of Thompson's arrest. Then, I broadened the pool to include PSR's for any individuals convicted for crack cocaine offenses in the District of Massachusetts in 1998 and 1999.

I identified individuals who would not be comparable to Thompson at all, i.e. those without children or other family obligations. I then divided the remaining individuals into four categories:

A. Positive Family Relationships—Positive Employment. These were individuals most comparable to Thompson, with a strong employment history and a strong familial bond.

B. Positive Family Relationships—Negative Employment. These were individuals with strong family relationships but a minimal employment record.

C. Negative Family Relationships—Positive Employment. These were individuals with strong employment but weak family ties.

D. Negative Family Relationships—Negative Employment. These were individuals with neither strong family ties nor a strong employment record.

With respect to the Bromley Heath pool: I eliminated the two individuals from this sample who had no children. In category D were two individuals who had no contact with their children, and another who had minimal contact and a minimal employment record.[19] In category B were four individuals who had strong ties to their families but could not provide for them due to their poor employment record.[20] In category C was one individual who had a strong employment record but did not see her children due to a serious substance abuse problem.

Only two individuals were worthy of comparison with Thompson in terms of family ties and responsibilities and employment record. The first, and most comparable individual, also a 24 year old male, pleaded guilty to two counts of distribution of cocaine base involving 21.15 grams.[21] Like Thompson, he was a Criminal History Category I. He had been with the same woman for 11 years, had a strong family relationship and a significant employment record. And, like Thompson, the presentence report stated that he was involved with his girlfriend's and son's lives,

---

18. Probation provided me with 66 presentence reports. The universe of individuals was dependent on how many individuals had complete presentence reports. Many individuals were still awaiting trial or were set to be sentenced at a future date. For example, while Thompson's arrest was part of a sweep in the Bromley Heath housing development that led to 26 federal crack prosecutions, only twelve of these reports were available.

19. This individual reported brief employment with a temporary agency in 1997 and two months working in a produce market in 1996. There was no other verifiable employment record. This individual had been in state custody from 1988–1992. In addition, all

three had restraining orders filed against them by their girlfriends or wives.

20. In two of the cases, the defendants were serious crack addicts. While they lived with their children, their addiction undermined their ability to be a parent and to hold a job.

21. Significantly, this individual was sentenced to 60 months (as was required by the 5 year mandatory minimum), the same term as the sentence Thompson received. To be sure, that result did not require a departure from the Guidelines; because lesser quantities were involved, the Guideline sentence was lower.

even though he did not live with them. He provided money for diapers, food and clothing for the child.

Before his arrest on the instant offense, this individual (from the Bromley Heath pool) worked for three months earning $7.50 an hour. His employer submitted a letter on his behalf at his bail hearing indicating that he was an excellent employee and would be welcomed back if released pending trial. Prior to this job, this individual had two short term jobs (both lasted four months) earning $8.00 an hour.

But unlike Thompson, the individual had significant gaps in his employment record—one for 13 months and the other for 9 months. Moreover, while he was diligent about pursuing work and seemed to do a good job when employed, he had not held any job for longer than four months.[22]

The second individual, a 23 year old male, also had a Criminal History Category I, and was actively involved with his family. He became involved with a woman in 1995, and has remained involved with her ever since, even planning to be married, until his arrest intervened. The couple has two children. The individual was notably involved emotionally and financially with the older child, but has had no contact with the other child who was born post-arrest. Furthermore, this individual also holds a union card as a carpenter, and worked steadily for Essex Newbury Contracting Services prior to arrest.

The significant difference, however, between this individual and Thompson, was that despite his family and employment circumstances, the individual pleaded guilty to two counts of distribution of cocaine base involving 119.6 grams, an amount substantially higher than the

amount with which Thompson was involved with. The higher amount would have placed the individual at a mandatory minimum of 10 years, but for a U.S.S.G. § 5K1 agreement with the government, which permitted the judge to sentence below the Guideline range and the mandatory minimum.[23]

When compared with the Bromley Heath pool—defendants convicted of crack cocaine sale, living in the same housing development, at the same time—Thompson's daily devotion to his family, financially and emotionally, and his consistent and exemplary work record, is truly "extraordinary."

Since I felt it was important to have as large a universe of comparison as possible, I also analyzed other defendants who were convicted of cocaine base distribution regardless of where they lived in the District of Massachusetts.. Again, I discovered that Thompson is "extraordinary" on all the relevant measures.

Twelve of these defendants had no children. In category D were seventeen defendants who had no contact whatsoever with their children, or who had minimal contact with their children. In category B were seventeen defendants with strong family ties but little to no employment record who were thus unable to contribute to their families' support. In category C were three defendants with strong employment records, but weak family ties. Finally, in category A were five individuals with both strong family ties and significant employment records. None of those cases, however, matched Thompson's. Four of the five had pleaded to charges involving large amounts of narcotics, far larger than Thompson's, or firearms.[24]

---

22. Significantly, this individual was sentenced to the same term as the sentence Thompson received, 60 months. To be sure, that result did not require a departure from the Guidelines; because lesser quantities were involved, the Guideline sentence was lower.

23. This individual was sentenced to 64 months.

24. One defendant had a guideline sentencing range of life imprisonment due to the fact that he was the leader in a large cocaine base conspiracy and was held responsible for distributing over 1.5 kilograms of cocaine base. Another individual had a Guideline range of 210 to 262 months due to the fact that he was found to have played a leadership role in

The only remaining individual (of the larger pool of defendants) pleaded to distributing 55.5 grams of cocaine base—slightly more than Thompson. That individual had held a steady job for the past two years doing maintenance work making $8.35 an hour. His supervisor reported that he had consistently good evaluations of his work. Although that defendant was reported to be a supportive father, it was unclear from the presentence report whether he had been able to provide financially for his girlfriend and child.[25]

Finally, the defendant in the comparison group had a Guideline range of 120 to 135 months because he was a Criminal History Category III.[26] In contrast, Thompson was a Criminal History Category I.

Thus, from a sample of 66 defendants in the Bromley Heath group and the larger group, I was able to find only three individuals remotely comparable to Thompson. Even among the three Thompson stands alone with respect to his family ties, his ability to meet the responsibilities required by his family, and his employment history. If Thompson is not "extraordinary" or out of the "heartland," given this universe, I do not know what defendant would ever qualify.

Not only did Thompson exhibit a sustained commitment to his family dating back to the instant he became a father, he consistently worked to provide for them. He was in the lowest Criminal History Category, although he grew up in a neighborhood where the temptation to resort to drugs, even violence, was always present. In short, Thompson has defied the odds.

When compared with other defendants accused of like offenses, regardless of where they are from, he is extraordinary.

For these reasons, based on my experience and research, I departed to a level 25 and sentenced the defendant to 60 months.

**SO ORDERED.**

---

distributing 1,578 grams of cocaine base and 574 grams of powder cocaine. A third individual in this category pleaded to distribution of 838.1 grams of cocaine base and 746.1 grams of powder cocaine. The last individual in this category pleaded to distribution of 34.27 grams of cocaine base and 34 grams of powder cocaine. It should be noted however that this individual was also found to be in possession of four stolen firearms. He also had no young children; all of his children were adults.

**25.** The presentence report stated that the defendant's girlfriend and child were receiving AFDC benefits.

**26.** This individual had two prior convictions—one for possession of a class B substance and one for distribution of a controlled substance within 1000 feet of a school. This individual also had a significant number of arrests, many of them for firearm related crimes, or crimes of violence.