**UNITED STATES of America,**

v.

**Paul S. LACARUBBA, Defendant.**

**No. 01–CR–10033.**

United States District Court,
D. Massachusetts.

Jan. 4, 2002.

Stephen G. Huggard, United States Attorney, Boston, MA, for U.S.

Paul J. Dee, Truelove & Dee, LLP, Boston, MA, Martin Boudreau, Milton, MA, Michael S. Pollok, John L. Pollok, Hoffman, Pollok & Pickholz, New York City, for Paul S. Lacarubba.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

This case raises questions concerning the status of sentencing departures in the First Circuit for "extraordinary family obligations" (under U.S.S.G. § 5H1.6) in the wake of two recent decisions, *United States v. Pereira*, 272 F.3d 76 (1st Cir. 2001) and *United States v. Thompson*, 234 F.3d 74 (1st Cir.2000).

In *Thompson*, the Court held that it was error when a trial court, seeking to determine if a departure for family obligations was warranted, compared the defendant to other defendants similarly situated with respect to the offense of conviction. Although the trial court based its decision on the express language of the Sentencing Reform Act ("SRA"),[1] the Guidelines,[2] and the scholarly commentary,[3] the Court disagreed, holding that the proper approach is to compare any given defendant to all defendants regardless of offense.

In *Pereira*, the Court held that a defendant must be found to be "irreplaceable" to his or her family before the Court can depart downward under this section. It noted that its decision was "nothing more than a distillation of existing judicial principles," 272 F.3d at 83, notwithstanding the fact that prior First Circuit cases, and sentences by trial judges within this dis-

---

1. The SRA authorized the United States Sentencing Commission to create sentencing guidelines that "provide certainty and fairness in meeting the purposes of sentencing, [thus] avoiding unwarranted sentencing disparities among defendants with similar records *who have been found guilty of similar conduct.*" 28 U.S.C. § 991(b)(1)(B). (Italics supplied).

2. In the Introduction to the Guidelines, the Commission states that through the Guidelines, "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences *imposed for similar criminal of-*

*fenses committed by similar offenders."* U.S.S.G. § 1A3, p.s.

3. Summarizing the structure of the Guidelines, one commentator stated: "Sentences were no longer to be indeterminate, but rather to treat similarly situated defendants who commit identical offenses comparably." Michael Edmund O'Neil, *Abraham's Legacy: An Empirical Assessment of (Nearly) First–Time Offenders in the Federal System*, 42 B.C. L.Rev. 291, 301 (2001). Mr. O'Neil is a Commissioner on the Federal Sentencing Commission.

trict and other jurisdictions, seemed to permit downward departures in a variety of situations short of "irreplaceability."

■ Putting the two cases together, then, as I am obliged to do, the law of the First Circuit is as follows: Before a court in the District of Massachusetts can depart downward for "extraordinary family obligations" the trial court must measure the defendant against all other defendants, no matter the crime of his or her conviction, and determine whether he or she is "irreplaceable."

I have, and the defendant in this case, Paul LaCarubba, is.

■ Mr. LaCarubba has pled guilty to an information charging two counts of tax evasion, in violation of 26 U.S.C. § 7201. The guideline range, without departure, was 18 to 24 months, with the parties' plea agreement recommending sentencing at the low end.[4] But after the plea agreement was signed, Mr. LaCarubba found out that his wife of thirty years had terminal liver cancer, a particularly virulent form of the disease.[5] Fewer than 20% of such individuals are alive within five years.

Mr. LaCarubba's role in his wife's care is critical. He administers chemotherapy injections to her in her groin. Expert material presented at sentencing suggests that while strangers may be paid to be caretakers, a husband is in a unique position to minister to his wife. Her mental health and even the duration of her survival, limited though it may be, is at stake. If anyone is irreplaceable to Ms. LaCarubba, it is Mr. LaCarubba. .

The principle I applied was simple: While Mr. LaCarubba deserved to be punished, his wife did not. Assuming the law allows for the humane concern for others, which I do, I departed downward three levels, from a level 13 to a level 10, and sentenced Mr. LaCarubba to three years' probation. In order to punish Mr. LaCarubba, I required him to spend one year in home confinement, with electronic monitoring, and to pay a substantial fine of $10,000.

## I. FRAMEWORK FOR ANALYSIS

While it is popular to stress one goal of the Sentencing Reform Act, uniformity, to the exclusion of all others, in fact the drafters endorsed other sentencing goals—notably, proportionality.[6] In its introduc-

---

**4.** The base offense level because of the amount of tax loss, $310,823.11, was 16 under U.S.S.G. § 2T4.1(k). Neither side argued for any adjustments other than acceptance of responsibility which would reduce the offense level to a 13. The defendant is in criminal history category I.

I do not address the facts of the offense in other respect. They are not relevant to the single issue contested by the parties.

**5.** The parties amended the plea agreement so that the defendant preserved his right to move for a downward departure based on family ties and responsibilities, and the government reserved the right to oppose.

**6.** The Sentencing Reform Act refers to "certainty and fairness" in sentencing. 28 U.S.C. § 991(b)(1). Fair sentencing policies must not only avoid "unwarranted dispari-

ties" among defendants similarly situated with respect to the offense, but also "maintain[ ] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B).

In addition, Congress ordered the Commission to establish policies and practices that met the traditional purposes of sentencing (retribution, deterrence, incapacitation, and rehabilitation) and to "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(2).

The Guidelines' Introduction notes that there are three objectives, honesty in sentencing, uniformity and proportionality. See U.S.S.G. § 1A.3.

tion, the Commission described the difficulties of creating guidelines that met both goals. Too much uniformity would create a system easy to administer but would threaten proportionality, while a guideline system that accounted for every conceivable relevant offender and offense characteristic would destroy uniformity and surely be unworkable. U.S.S.G. § 1A.4(b); 1A.3.[7]

The Sentencing Guidelines were the compromise. In the interest of uniformity, the Commission created guidelines that purported to take into account many factors relating to the offense, the offender's criminal history, and to a lesser degree, other offender characteristics. In the interest of proportionality, the Commission gave courts the discretion to depart from the guideline sentence when additional factors existed that made the case unusual.[8] The Commission itself noted that "it is difficult to prescribe a single set of guidelines that encompass the vast range of human conduct potentially relevant to a sentencing decision." [9] As a general matter, the Commission used the idea of "heartland" to distinguish between the "typical" cases, which should be sentenced uniformly, according to the Guidelines, and those "atypical" cases for which a departure is warranted.[10]

Departures were not "violations" of the Guidelines, but rather part and parcel of its goals and the Guidelines' evolution. Indeed, recognizing that departures would necessarily lead to differences in sentencing between similarly situated offenders, the Congress spoke of "unwarranted" disparities.[11] Departures grounded in the atypical facts of the individual case were "warranted."

In the case of family ties, the statute directed the Commission to "assure that the guidelines ... reflect the general inappropriateness" of this factor to sentencing. 28 U.S.C. § 994(e). Specifically, the Commission translated this directive into the policy guideline that family ties are "not ordinarily relevant." U.S.S.G. § 5H1.6.

But the Commission's language is far from clear. While other guidelines—what the base offense level is for a given quantity of drugs, for example—are precise, this guideline is vague. While other guidelines provide an elaborate rationale or even spe-

---

**7.** *See also* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1, 13 (1988).

**8.** The legislative history of the SRA suggests that the Congress intended that judges retain discretion to impose individualized sentences in special cases. The Senate Judiciary Committee instructed judges to examine the characteristics of each specific offender thoughtfully and comprehensively. S.Rep. No. 98–225, at 52 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3235 (hereinafter "Senate Judiciary Committee Report"). "The purpose of the sentencing guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences." *Id.*

**9.** U.S.S.G. Ch. 1, Pt. A, 4(b).

**10.** U.S.S.G. Ch. 1, Pt. A, 3, 4(b).

**11.** 18 U.S.C. § 3553(a)(6)(1988), 28 U.S.C. § 991(b)(1)(B). As Professor Freed notes: "Disparity is a surface phenomenon. It raises the question: why are two seemingly similar cases sentenced differently? When the answer is persuasive in terms of the nature and circumstances of the offense, the history and characteristics of the offender, and the purposes of sentencing, the apparent disparity is in fact warranted. When the disparity cannot be satisfactorily accounted for, it is unwarranted." Daniel J. Freed, *Federal Sentencing in the Wake of the Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 Yale L.J. 1681, 1705 (1992).

cific examples,[12] this guideline does not. Nor did the Commission publish evidence to support its conclusion that "offender characteristics are not ordinarily relevant," even though Congress encouraged it to "subject those factors to intelligent and dispassionate professional analysis; and on this basis to recommend, with supporting reasons, the fairest and most effective guidelines it can devise."[13] It never made available to courts and advocates the data supporting the "typical case," from which to judge the atypical.[14] There is no legislative history, as there would be with statutes, no committee reports, no public hearings to which a trial court should refer.[15]

The only conclusion one can draw is this: Congress and the Commission wanted *courts* to interpret these provisions as they sought to individualize sentences, to create a common law of sentencing defining the boundaries of typicality and atypicality.

How does a court go about this task? The enterprise is in part empirical. How does this human being compare to others the trial court has seen? But it necessarily involves more than simply counting noses. How atypical does he or she *have* to be—one in a million, five in a million, five percent of all defendants, etc.? This kind of line-drawing involves the exercise of normative judgments: What kind of punishment do human beings facing these situations *deserve* given the purposes of the SRA? Where *ought* the line between typical and atypical be? No bright line rule was announced by the Commission; none can be announced by a court.[16]

12. *See e.g.,* U.S.S.G. § 1B1.3, comment and "Illustrations of Conduct for Which the Defendant is Accountable."

13. Senate Judiciary Committee Report, *supra* note 8, 1984 U.S.C.C.A.N. at 3358.

14. In general, while the Guidelines instruct courts to depart from Guideline sentences when "a particular guideline linguistically applies but where conduct significantly differs from the norm," they made no effort to define what the norm is. U.S.S.G. § 1A.4

This is especially the case with respect to family ties. As one commentator noted: "That the Commission at least considered family circumstances is clear, but what it believed to be 'ordinary' family circumstances and the ordinary and tolerable consequences of incarceration upon a family is somewhat shrouded in mystery and subject to intense speculation." Karen R. Smith, *United States v. Johnson: The Second Circuit Overcomes the Sentencing Guidelines' Myopic View of "Not Ordinarily Relevant" Family Responsibilities of the Criminal Offender*, 59 Brook. L.Rev. 573, 607 (1993). Indeed, the legislative history suggests that Congress discouraged courts from considering family ties in order to keep them from departing upward in the case of disadvantaged defendants. Congress warned the Commission to "guard against the inap-

propriate use of incarceration for those defendants who lack education, employment and stabilizing ties." Senate Judiciary Committee Report, *supra* note 8, 1984 U.S.C.C.A.N. at 3358. *See also* Susan E. Ellingstad, *The Sentencing Guidelines: Downward Departures Based on a Defendant's Extraordinary Family Ties and Responsibilities*, 76 Minn. L.Rev. 957, 973 (1992).

15. The legislative history indicates that Congress took this approach in order "to guard against the inappropriate use of incarceration for those defendants who lack education, employment, and stabilizing ties." *United States v. Floyd*, 945 F.2d 1096, 1101 (1991), *amended by* 956 F.2d 203 (9th Cir.1992) (quoting S.Rep. No. 98–225, at 175 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3358, on 28 U.S.C. § 994).

16. In *United States v. Rivera*, 994 F.2d 942, 948 (1st Cir.1993), the Court noted:

It may not be unusual, for example, to find that a convicted drug offender is a single mother with family responsibilities, ... at some point, the nature and magnitude of family responsibilities (many children? With handicaps? No money? No place for the children to go?) may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary.

It was not surprising then that the Supreme Court held that the discretion to depart from the Guidelines had to reside in the first instance in the trial court. Its normative judgment, after all, was framed by many, many cases, and the opportunity to look the defendant and his family in the eye. As the Court noted in *Koon v. United States*, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (citations omitted):

> ... A district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court ... [T]he district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day to day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.

Courts of Appeal see only a small percentage of Guideline cases: Only those in which a trial court has granted a departure, not those in which a departure was declined, and of the departure cases, only those which the government has chosen to appeal. Furthermore, the formal case law is limited still more. Few district court judges write decisions embodying their reasoning; many appellate decisions are not published and arguably, have limited precedential value.

And beyond the numbers is the vantage point of the district court that has direct contact with the human being, the family members, the neighbors, and the children, not just the cold record.[17] Just as institutional comity requires deference to state courts in habeas proceedings, even when the reviewing court agrees that they have made federal constitutional errors, so institutional comity requires deference to the trial court in sentencing departures. The issue is not whether another judge would disagree in comparable circumstances, but whether the court's decision fits within the range of reasonable outcomes in the light of the language of the Guidelines, its structure, the SRA and the purposes of sentencing.

## A. *United States v. Pereira*

In *Pereira*, the defendant pled guilty to subscribing false tax returns and using the mails for commercial bribery. The trial court found Pereira's offense level to be sixteen but departed downward to a level ten, based on his extraordinary responsibilities for the care of his parents. The court sentenced Pereira to three years of probation with six months' home confinement. The First Circuit, concluding that the district court had erred, reversed the sentence and remanded the case.

The Court concluded that the defendant must show that the care he or she rendered was "irreplaceable" to qualify for this departure. 272 F.3d at 81–82. This was not an interpretation of the words of

---

**17.** Judge Weinstein said, "[M]ost [judges] find it extremely difficult to look into the eye of another human being and punish him or her severely, particularly when the family is standing by, about to suffer more than the defendant." Jack B. Weinstein, *A Trial Judge's First Impression of the Federal Sentencing Guidelines*, 52 Alb. L.Rev. 1, 10 (1987).

the Guidelines—as one would interpret the words of a statute. Nor was it an interpretation of the Guidelines' legislative history, or the legislative history of the relevant statutory reference in the SRA. Rather, the Court suggested that the standard was "nothing more than a distillation of existing judicial principles." 272 F.3d at 83. To understand the standard more fully, it is helpful to review that case law which the Court distilled, and the case law which the Court rejected.

The Court cited to cases in the First, D.C., Third, Fourth, Eighth and Tenth Circuits in which courts reversed family departures.[18] These cases, the Court suggested, carved out a "heartland" of cases in which family members suffer "immense hardships" and yet no departure was warranted. 272 F.3d at 81–82. The space outside the "heartland", according to the Court, is reserved for instances in which the defendant is "irreplaceable." *Id.*

Two cases were cited by the Court to illustrate what "irreplaceability" is. In *United States v. Haversat*, 22 F.3d 790, 797 (8th Cir.1994), the Court held that the defendant's care for his ailing wife justified a departure, where the defendant was needed to "identify the beginning of any regressions and to seek out immediate treatment to avoid 'a serious situation.'" *Id.* The Court also cited, approvingly, *United States v. Sclamo*, 997 F.2d 970, 972–74 (1st Cir.1993), where the defendant's personal presence was needed to

assist in the care of a twelve-year-old boy who suffered from a clinical disorder and whose condition would deteriorate in the defendant's absence.

Significantly, the Court's "distillation" of the case law did not include Second Circuit cases, which have drawn the family departure lines differently. In *United States v. Galante*, 111 F.3d 1029, 1034 (2d Cir.1997), for example, the Court—in a somewhat lyrical fashion—underscored the normative, subjective nature of the departure decision as a reason for deference to the trial court: "What is 'exceptional' is—like the beauty of Botticelli's 'Venus Rising From the Sea'—a subjective question because the overall conclusion is one resting in the eye of the beholder ... [T]he sentencing court ... is in the best position to make comparisons and decide what combination of circumstances take a case out of the ordinary and make it exceptional." Although Galante's wife was employed and college educated, the Second Circuit affirmed the departure based on his wife's limited English-speaking capabilities, and the financial dependence of his disabled father and two children. *See also United States v. Alba*, 933 F.2d 1117 (2d Cir.1991) (affirming a downward departure for a defendant who worked two jobs in support of his wife, two children, grandmother and disabled grandfather even though the defendant's spouse would have been able to care for the children and elderly dependents); *United States v. Johnson*, 964 F.2d

18. "[T]ime consuming family responsibilities" were not enough, 272 F.3d at 80 (citing *United States v. Carr*, 932 F.2d 67 (1st Cir.1991)), even when both parents were facing incarceration. Nor was care of a nine-year-old son in need of special supervision and a wife in fragile mental health, *United States v. Rybicki*, 96 F.3d 754 (4th Cir.1996); or where the defendant was a single mother and the sole provider for five children, one of whom required special care, *United States v. Sweeting*, 213 F.3d 95 (3d Cir.2000); or where the

defendant's incarceration would lead to the placement of three children under the age of four, including one who was being breast fed, into foster care, *United States v. Rushby*, 936 F.2d 41, 42–43 (1st Cir.1991); or where the defendant supported three children and a wife with depressive disorder and panic attacks, *United States v. Goff*, 20 F.3d 918, 921 (8th Cir.1994); or where the defendant was the sole support of two children and an elderly diabetic mother, *United States v. Archuleta*, 128 F.3d 1446 (10th Cir.1997).

124 (2d Cir.1992) (affirming a downward departure for a mother solely responsible for raising four children including a small infant).

Many questions remain. Does the "irreplaceable" standard mean that the departure is only available to effect a sentence of probation? Once someone is in jail for a period of time, they have presumably already been "replaced." How does that square with the holding in *United States v. Canoy,* 38 F.3d 893, 906 (7th Cir.1994), that extraordinary family ties can permit a departure whether or not that departure results in probation? Moreover, in *United States v. Thompson, supra,* I asked whether the purpose of this departure was defendant-focused, namely to reward a defendant's extraordinary good works, or to take account of an extraordinary burden on the defendant, like losing custody of a child. Or was the departure focused on dependents, to address the impact of incarceration on innocent family members? By implication, the Court's analysis suggests the latter; the only relevant question is the impact of incarceration on innocent dependents.

The First Circuit did not explain why it was rejecting the Second Circuit's standard, or why the hardships it identified should make a difference to the sentence, and other familial hardships should not. It did not tie its decisions to the goals of the Guidelines or the policies undergirding them. It indicated that henceforth the standard for this kind of departure would be a relatively stringent one, irreplaceability.

### B. *United States v. Thompson*

In *United States v. Thompson,* 234 F.3d 74, 77–78 (1st Cir.2000), the Court indicated that family circumstances must be measured against the population of all federal defendants regardless of offense, rather than, in the statute's language, defendants "with similar records who have been found guilty of similar conduct." 28 U.S.C. § 991(b)(1)(B).

Combining *Pereira* and *Thompson,* I am obliged to ask: Is Mr. LaCarubba irreplaceable to his dependant, his wife, relative to all other defendants?

I have considered the cases which I have sentenced. In addition, I have reviewed the case files of other defendants sentenced by other judges, where departures were granted on extraordinary family circumstances—without government appeal.[19] A few examples: *United States v. James King,* 93–10289, where Judge Tauro departed downward when the defendant had two young children and his wife was a codefendant; *United States v. Mora,* 98–10401, where Judge Keeton departed downward because the defendant was the caregiver for four children, one of whom had special needs; *United States v. Viarengo,* 97–30004, where Judge Ponsor departed downward because the defendant was the only one available to care for a young daughter; or *United States v. Caesar,* 99–10210, where Judge O'Toole de-

---

**19.** To the extent that this decision relies on the Court's review of the presentence reports of all defendants who have been given departures for extraordinary family circumstances in this jurisdiction, these reports can be made available to counsel. The Federal Defenders Office for the District of Massachusetts maintains compilations of departures in this district, taken from the judgments entered in those cases. *See* Federal Defender Office District of Massachusetts and New Hampshire, available at: http://www.channell.com/users/defender (password required for access). In addition, redacted versions have been made available to counsel in *United States v. Thompson,* 74 F.Supp.2d 69 (1999). In order to give counsel the opportunity to review these reports, this memorandum will be issued first, and the judgment will follow five days later.

parted downward because the defendant had five children, one of whom had cerebral palsy; or *United States v. Matthews*, 98–10329, where Judge Stearns departed for a defendant with four children who had minimal participation in the crime; or *United States v. Prince*, 00–10319, where Judge Lindsay departed when the defendant provided the sole support for her family, and her husband was unreliable and had physically abused the defendant; or *United States v. Gilberg*, 93–10234, where Judge Woodlock departed so that the defendant could care for his wife who was ill with a blood disorder; or *United States v. Collette*, 97–10105, where Judge Keeton departed because the defendant's absence would be harmful to her daughter due to her daughter's long-term medical problems; or *United States v. Jeanetti*, 92–10109, where Judge Tauro departed for a defendant who took care of his disabled father several days a week.

To be sure, these cases predate *Pereira*. Although the Court labeled its standard "nothing more" than a "distillation" of the case law, given this record, I can only assume that the Court made a judgment to narrow the application of this departure.

## C. *Does LaCarubba Meet the Standard of Pereira and Thompson?*

In April 2001 Ms. LaCarubba, married to the defendant for thirty years, underwent surgery to remove her gall bladder. During the operation, several cancerous tumors were discovered in her small bowel and liver. Medical records provided by the defendant from her treating physicians indicate that due to the distribution of the metastatic tumor in the liver, she was not a candidate for surgery. Ms. LaCarubba's oncologist, Dr. Mindy S. Bohrer, has advised that the malignancy is incurable; less than 20% of the individuals with it are alive after five years.

Ms. LaCarubba and her husband have two children who live in the Northeast. They were advised by Ms. LaCarubba's doctors that it would be better for her health to move to Florida. They did, although that move made Ms. LaCarubba more dependent on her husband. The defendant administers his wife's chemotherapy treatments via injections in her groin. She cannot administer the drug herself. She relies on him to transport her to medical visits and to run the household. In time, she will come to rely on him more and more for the essentials of daily living. Ms. LaCarubba's fatigue is constant and pain in her abdomen and back have increased in frequency. Mr. LaCarubba also provides care for his elderly mother who lives near them.

But Mr. LaCarubba provides more than physical or financial support. Because the condition is incurable, medical modalities, like chemotherapy, have limited efficacy. Ms. LaCarubba relies on her husband's emotional support. Dr. Edward Butler, along with many of the doctors whose letters I read, suggests that it is imperative that Mr. LaCarubba be available to devote attention to his wife during the progression of the disease for her psychological well-being. While these letters did not use the specific language of *Pereira*, their gist was that Mr. LaCarubba was irreplaceable to his wife during this period, and would likely become more so.

For example, Dr. David Klimstra, a pathologist at Sloane Kettering Cancer Center, reports:

> With time, the patient will become progressively debilitated, both due to the effects of the tumor and to side effects of any chemotherapeutic regimens that may be attempted. The full physical and emotional support of the patient's husband and family will be essential to give her the best chance of long-term survival. Given the relative inability of

available medical therapy to effectively treat this disease, the importance of supportive care cannot be overemphasized.

Of course, one could say, as the government has argued, that Mr. LaCarubba could afford another caregiver to come to the home while he is in jail. Surely someone else can be trained to give Ms. LaCarubba her groin injections. Or one could say that the family could move back to the Northeast and have the daughters care for their mother.[20] Or one could say that the daughters could move to Florida to care for their mother. Or one could say that it is entirely possible that Ms. LaCarubba could survive the defendant's 18 months' incarceration, that the progressive deterioration the doctors predict will somehow be delayed.

It is always available to the government to characterize a case at the highest level of abstraction, at that rarified point where all cases look alike, and none are atypical: The case is about dependents; everyone has dependents who are harmed by a defendant's absence. The case is about spousal obligations; everyone has obligations to their spouses that are undermined by the defendant's incarceration. The case is about sick relatives; everyone has relatives that are or may become sick during their incarceration.

But this enterprise is not about word games. I see a continuum of cases representing the adverse impact a defendant's incarceration can have on innocent dependants, from the "ordinary burdens" to "significantly" more burdens than usual. The issue is at what point on that contin-

uum burdens are imposed on innocent dependents that are simply not justified by our legitimate need to punish the wrongdoer, that are cruel and unnecessary.

Whatever "irreplaceable" means, it surely applies to a situation like this one. In *Sclamo*, which the Court cited approvingly in *Pereira*, the First Circuit permitted a departure based on a showing of a strong relationship between a defendant and his lover's son, even though the child's mother—not the defendant—had custody of her son. The defendant was somehow "irreplaceable" even though other caretakers could—imperfectly—substitute for him.

And then there are a host of cases involving husbands who are the unique caretakers of wives who are gravely ill, as *Haversat*, and *United States v. Gaskill*, 991 F.2d 82 (3rd Cir.1993).

Caretaking, in short, goes beyond physical acts, and includes emotional and psychological attachments. It is not just a question of any two arms, any old paycheck.[21] A husband of thirty years stands in a different position relative to a wife than any caregiver.

Finally, this case is different in one other respect. The impact of Mr. LaCarubba's absence could be to hasten Ms. LaCarubba's death. As the Court has noted in other settings, "death" is different in its finality.

I conclude that this is a justified departure. These family responsibilities do not remotely lessen the defendant's culpability for the crimes he has committed. I depart only in recognition of my unwillingness to

20. Their daughter's affidavit suggests that such a move would be extremely difficult for them, but not impossible. One daughter has a small child and is expecting a second. The second works two jobs.

21. Rivera ultimately approved a departure, where the defendant had several young children, without discussion of whether other rel-

atives can or will care for the children, *see United States v. Rivera*, 994 F.2d at 952–54 (three children under six); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991) (two children, living with disabled dependent father and grandmother; no indication that defendant's spouse cannot fulfill family responsibilities).

wreak havoc on the life of the dying Ms. LaCarubba. If this departure means other offenders without dying spouses get longer sentences, so be it; it is warranted by the Guidelines, by the facts, by our common humanity.

Even the Supreme Court has recognized that the "consistency produced by ignoring individual differences is a false consistency." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Here it would be more than false; it would be cruel.

## II. *CONCLUSION*

For the reasons stated above, I departed downward three levels, from a level 13 to a level 10, and sentenced Mr. LaCarubba to three years' probation, with one year in home confinement and electronic monitoring, and to pay a substantial fine of $10,000.

Final judgment in this matter will issue on January 11, 2002.

**SO ORDERED.**