**UNITED STATES of America,**

v.

**John THOMPSON, a/k/a "Mo Mo," Defendant.**

**No. CRIM.A.98–10332–NG.**

United States District Court, D. Massachusetts.

Feb. 14, 2002.

Theodore B. Heinrich, for U.S.

## MEMORANDUM AND ORDER RE: RE–SENTENCING

GORTON, District Judge.

This case involves the re-sentencing of the defendant, John Thompson, in the light of the First Circuit's decision in *United States v. Thompson,* 234 F.3d 74 (1st Cir. 2000) (*"Thompson II "*). Mr. Thompson pled guilty to Count Five of a multi-count indictment, charging him with the distribution of cocaine base on February 11, 1997 in violation of 21 U.S.C. § 841(a)(1).[1] The charges grew out of a joint federal-state investigation of crack cocaine trafficking at the Bromley Heath Housing Development in Jamaica Plain, Massachusetts.

On November 9, 1999, Mr. Thompson was sentenced to a term of imprisonment of sixty months, representing a downward departure of 17 months. The departure was based on Mr. Thompson's extraordinary family circumstances (under the authority of U.S.S.G. § 5H1.6). *See United States v. Thompson,* 74 F.Supp.2d 69 (D.Mass.1999) (*"Thompson I "*).

Central to *Thompson I* was a question: If this category of departure pivots on a finding of "extraordinary" family circumstances, what set of facts comprises "ordinary" family circumstances? To answer the question, I compared this defendant to defendants similarly situated with respect to the offense of conviction, evaluating the presentence reports ("PSRs") of fifty-four defendants. That group included codefendants in Mr. Thompson's case and, more generally, all defendants convicted of crack distribution in the District of Massachusetts. *Thompson I,* 74 F.Supp.2d at 76–79. In addition, I raised another question: What was the underlying purpose of this departure—to reward a defendant for a good life, or to address the impact of incarceration on innocent third parties?

I concluded that based on either standard, relative to Mr. Thompson's codefendants in the Bromley Heath investigation, or all other defendants convicted of a like offense, Mr. Thompson's family circumstances were extraordinary. I outlined the reasons in detail in *Thompson I,* and more generally here:

Mr. Thompson grew up in the Bromley Heath projects of Jamaica Plain. He barely knew his own father, who was in and out of jail throughout his life. Mr. Thompson was twenty-four years old at the time of the first sentencing, and he had never before been incarcerated. Indeed, his record—one conviction for assault and

---

1. Mr. Thompson was originally charged in a five count indictment, whose substantive counts alleged distribution on January 13, 16, and 21, 1997.

battery—reflected few encounters with law enforcement of any sort. *See Thompson I,* 74 F.Supp.2d at 71 n. 6. He left high school when his girlfriend, Breii Murray, became pregnant. Unlike many in his peer group, he was determined to provide for her and their daughter, Jabria, despite his youth and lack of education. He became a member of Union Local 223 and maintained steady employment until his arrest on these charges.

Whatever role drug dealing played in Mr. Thompson's life, it was minor. He supported his fiancee, and his daughters (a second daughter, Johnaiya, was born shortly after Jabria) both financially and emotionally. He took his eldest daughter to school each day and participated in his daughters' care each day. He was determined to be the father that he had never had. In addition, Mr. Thompson was embraced by Ms. Murray's family. He took his fiancee's 80–year–old aunt to church each Sunday, and contributed to her household expenses. Released pending trial, Mr. Thompson continued to live his life along these lines. When he was released pending trial, the defendant continued to live the life of a responsible parent, friend, worker. He did not experience a sudden conversion just because the federal authorities were at his heels.

While I departed downward, the defendant's final sentence was severe, particularly for a young man who had never before been in prison. He was sentenced to the mandatory minimum of 60 months.

On December 8, 2000, the First Circuit vacated the defendant's sentence and remanded for re-sentencing. *United States v. Thompson,* 234 F.3d 74 (1st Cir.2000) (*"Thompson II"*). It answered the first question concerning the scope of compari-son by holding that the proper approach is to compare any given defendant, regardless of the offense of which he has been convicted, to all defendants and not those similarly situated with respect to the offense of conviction. It did not answer the second question—the purpose of this departure.

Between the time of *Thompson II* and the instant re-sentencing, the First Circuit decided *United States v. Pereira,* 272 F.3d 76 (1st Cir.2001), which apparently answered that question. The Court implied that the only issue of relevance in evaluating family departures under U.S.S.G. § 5H1.6 is the impact that a given sentencing can have on innocent third parties, not what family circumstances reflect about the defendant's culpability.[2]

On re-sentencing, Mr. Thompson raised the same issue as before: a downward departure for extraordinary family circumstances. In addition, the defendant raised two new issues: He sought the benefit of the "safety valve" under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1 .2, and he argued for a departure based on his extraordinary post-sentencing rehabilitation.

With respect to the application for "safety valve" treatment, while I have concluded that the defendant should be given an opportunity to meet the requirements, I cannot conclude that he has in fact qualified for it. The government has raised questions concerning the completeness of the defendant's proffer that the defendant could not adequately rebut. With respect to the departure for extraordinary family obligations, while I remain concerned about the validity of the First Circuit's approach, I have, of course, followed it. I have reviewed every departure for ex-

---

**2.** In *Pereira,* the court held that a defendant who could not show that he was "irreplaceable" to his or her family or "otherwise ex-traordinary" could not under the circumstances of that case, qualify for a family circumstances departure. 272 F.3d at 82.

traordinary family circumstances given to every single identifiable defendant in this District for the past ten years regardless of the crime of conviction. In applying the *Pereira* standard to the analysis, I cannot say that Mr. Thompson's "family circumstances" meet these standards.

However, I have come to a different conclusion in connection with Mr. Thompson's motion for departure based on post-sentencing rehabilitation. His record at Ft. Devens has been extraordinary. He has taken advantage of literally every program that the institution has offered. And notwithstanding his limited income in prison, he continues to support his family and his church even making a contribution to the American Red Cross after the tragedy of September 11, 2001. Accordingly, on January 24, 2002, I again departed downward to level 25 and sentenced Mr. Thompson to 60 months imprisonment.

### A. Can the defendant can take advantage of the "safety valve" under U.S.S.G. § 5C1.2? [3]

■ Mr. Thompson, who declined to make use of the "safety valve" under U.S.S.G. § 5C1.2 (" § 5C1.2") at his first sentencing, changed his mind at re-sentencing.[4] The government claims that he may not take advantage of § 5C1.2 because the district court lacks the power to review Mr. Thompson's sentencing *de novo*. I disagree. Nothing in the mandate from the Court of Appeals in this case bars Mr. Thompson from taking advantage of § 5C1.2. *See United States v. Maldonado*, 242 F.3d 1, 4 (1st Cir.2001) ("it is hard to find an appeals court forbidding *de novo* re-sentencing, unless the mandate has affirmatively restricted the remand.") [5]

3. The statute provides in pertinent part:
Notwithstanding any other provision of law, in the case of an offense under [ ] . . . the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under § 994 of Title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation that -
(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon . . . in connection with the offense;
(3) the offense did not result in death or serious bodily injury to any person;
(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines, and was not engaged in a continuing criminal enterprise . . . ;
(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with the requirement.
18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2.

4. On August 4, 1999, I continued Mr. Thompson's sentencing hearing for one week in order for him to reconsider the proffer. On August 11, 1999, Mr. Thompson stated that he did not want to make use of the "safety valve" for a downward departure. After the First Circuit reversed, Mr. Thompson reconsidered, and sought to make a proffer under § 5C1.2.

5. Plainly, if Mr. Thompson had engaged in crimes while in prison after the first sentencing, or had committed a series of disciplinary violations, nothing would have stood in the way of the government pointing that out to the Court given the terms of the *Thompson I* remand. Likewise, conduct of the defendant that advantages him—here, agreeing to give a proffer—should be considered given the terms of the remand. As the First Circuit noted:

Criminal procedure, like the rest of life, is filled with situations in which fortuities

Second, the government argues that Mr. Thompson, because of his refusal to take advantage of § 5C1.2, waived his right to avail himself of that provision. Plainly, a defendant cannot be held to have waived issues he did not bring up at an earlier proceeding. In *Maldonado*, for example, the defendant raised issues in his re-sentencing which had not been raised at the earlier sentencing without objection by the First Circuit. *Maldonado*, 242 F.3d at 3–4.

Citing to *United States v. Ticchiarelli*, 171 F.3d 24 (1st Cir.1999), the government suggests that the instant case is different because of defendant's affirmative conduct: his express refusal to avail himself of § 5C1.2. But *Ticchiarelli* is inapposite. In *Ticchiarelli*, the district court made an explicit finding at the first sentencing that the defendant was a manager, supervisor, or leader of the conspiracy under U.S.S.G. § 3B1.1. The defendant's initial appeal did not challenge the court's manager/leader finding. Applying the "law of the case" doctrine, the First Circuit held that the district court could not reopen the issue. Significantly, however, *Maldonado* does not cite *Ticchiarelli*. In *Maldonado*, the defendant was permitted to raise issues on re-sentencing as to which there had been no previous findings by the court.

Here, there was no prior finding on the safety valve issue. Indeed, the only rea-son the issue was even mentioned in the first sentencing was because of the Court's inquiry. If the Court had remained silent, Mr. Thompson would have been in exactly the same position as Maldonado.

In any event, the government's position is disingenuous. As I noted at re-sentencing, if the defendant suddenly decided to come forward with information on a major fugitive in order to receive a departure on the basis of substantial assistance or the safety valve, surely no one would wag his finger and say, "sorry, too late," no matter what position the defendant had taken at the first sentencing.[6]

Nothing in the language of the safety valve, its legislative history, or its rationale suggests a different result. The safety valve was designed to give low-level drug offenders who played only supporting roles in drug trafficking schemes an opportunity to mitigate the harsh effects of mandatory minimum sentences, even when their cooperation is not sufficient for the government's U.S.S.G. § 5K1 motion. They are to be given an opportunity for a truthful rendition of the events, whether or not the government actually receives any beneficial information.

The fact that Mr. Thompson did not take advantage of the safety valve in the first sentencing cannot be held against him in the re-sentencing. In this country, we

work to the benefit or disadvantage of a prosecutor or defendant. For example, where a retrial is ordered because of some mistake in the instructions, witnesses may have died in the interval or new ones been discovered, so that the evidence at the new trial is quite different, sometimes favoring the prosecution and sometimes the defense. Section 2255 being silent, it seems to us that the best approach is to retain some flexibility.

*Maldonado*, 242 F.3d at 3.

**6.** The government also cites to *United States v. Jordan*, 162 F.3d 1 (1st Cir.1998) for the prop-osition that the safety valve is not available. However, *Jordan* deals with 18 U.S.C. § 3582(c)(2) (" § 3582(c)(2)"), in which remand is more limited. Section 3582(c)(2) permits the court to change a defendant's sentence based on a specific change in the Sentencing Guidelines. The trial court's charge at the sentencing following such a Guideline change is a more limited one—surely not de novo—than the trial court's charge following a general remand, as in the instant case.

do not assume that defendants must confess and "tell" on friends and neighbors, even though we reward them when they do. We do not—or should not—regard the decision to incriminate oneself and/or others as an easy one. The fact that the defendant changed his mind about giving a proffer after spending some time in a federal prison does not mean that his earlier decision should somehow count as a waiver of his right to claim safety valve benefits.

■ But while Mr. Thompson had the right to try to qualify for the safety valve, I agree with the government that he has not done so here. The statute makes it clear that no weight should be placed on the value of the proffer to the government, but only on its truthfulness.[7] The government argued that Mr. Thompson's account failed to meet this standard.

It is extremely difficult for the Court to evaluate the government's position. Defense counsel plainly wanted to limit the proffer to the specific sale to which the defendant pled guilty, and the other sales referred to in the counts the government agreed to drop—and little more. The government had a broader view, seeking to question the defendant about drug dealing on other occasions. From the government's perspective, Mr. Thompson seemed to be hiding information. Moreover, they believed his answers were implausible based on their analysis of his demeanor and on information gleaned from other sources, including cooperating witnesses.[8]

Mr. Thompson may well have been holding back, based on his counsel's advice about the appropriate scope of questioning. His account of his drug activities may well have been different from that of the cooperating witnesses. The problem is that on this record I have no way of knowing who is telling the truth, and the salience of the information that Mr. Thompson supposedly left out. Under these circumstances, the party with the burden of proof—here the defendant—has failed. I cannot conclude that defendant met the requirements of the safety valve.

## B. Does the defendant qualify for a departure based on extraordinary family circumstances?

In *United States v. Lacarubba*, 184 F.Supp.2d 89 (D.Mass.2002), I dealt in detail with the standard for evaluating a defendant's eligibility for a departure based on extraordinary family circumstances after the First Circuit's decision in *Thompson II* and *United States v. Pereira*, 272 F.3d 76 (1st Cir.2001). I will not revisit that discussion except to outline the following general principles.

The Commission's language in U.S.S.G. § 5H1.6 that family ties are "not ordinarily relevant" is hardly clear. U.S.S.G. § 5H1.6. While other Guidelines—for example, the base offense level for a given quantity of drugs—are precise, this Guideline is vague. While other Guidelines pro-

---

**7.** The statute states, "the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." 18 U.S.C. § 3553(f)(5).

**8.** The government contends, for example, that Mr. Thompson was not entirely forthcoming at the start of the proffer session and amplified his answers, to a degree, towards the end.

Again, that pattern could either reflect the fact that Mr. Thompson was being evasive, or that he was following his lawyer's advice about the appropriate scope of the questioning. The record reflects that in the middle of the proffer session, the defendant conferred with his counsel, and returned to give more information—albeit not as much as the government deemed sufficient to qualify for a complete and truthful proffer.

vide a rationale or even specific examples,[9] this Guideline does not. Nor did the Commission publish evidence to support its conclusion that "offender characteristics are not ordinarily relevant."[10] U.S.S.G. § 5H1.6. It never made available to courts and advocates the data supporting the "typical case," from which to judge the atypical.[11] There is no legislative history and no public hearings to which a trial court can refer.

The logical conclusion is this: Congress and the Commission wanted *courts* to interpret these provisions as they sought to individualize sentences, to create a common law of sentencing defining the boundaries of typicality and atypicality. And in that enterprise, the district court plays a unique and important role.[12]

How does a court go about this task? I described it in *Lacarubba:*

> The enterprise is in part empirical. How does this human being compare to others the trial court has seen? But it necessarily involves more than simply counting noses. How atypical does he or she *have* to be—one in a million, five

in a million, five percent of all defendants, etc.? This kind of line-drawing involves the exercise of normative judgments: What kind of punishment do human beings facing these situations *deserve* given the purposes of the SRA? Where *ought* the line between typical and atypical be? No bright line rule was announced by the Commission; none can be announced by a court.

*Lacarubba,* 184 F.Supp.2d at 93–94.

### 1. Scope of review under Thompson

In *Thompson II,* 234 F.3d at 77–78, the First Circuit indicated that family circumstances must be measured against the population of all federal defendants regardless of offense, rather than, in the statute's language, defendants "with similar records who have been found guilty of similar criminal conduct." 28 U.S.C. § 991(b)(1)(B).

I have made that comparison. I have reviewed all PSRs of all identifiable defendants who received downward departures for family circumstances, and made those

9. *See, e.g.,* U.S.S.G. § 1B1.3, comment and "Illustrations of Conduct for Which the Defendant is Accountable."

10. There is no report, even though Congress encouraged the Commission to "subject those factors to intelligent and dispassionate professional analysis; and on this basis to recommend, with supporting reasons, the fairest and most effective guidelines it can devise." S.Rep. No. 98–225 at 175 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182 at 3358.

11. In general, while the Guidelines instruct courts to depart from Guideline sentences when "a particular guideline linguistically applies but where conduct significantly differs from the norm," they made no effort to define what the norm is. U.S.S.G. § 1A.3, 2–3. This is especially the case with respect to family ties. As one commentator noted: "That the Commission at least considered family circumstances is clear, but what it

believed to be 'ordinary' family circumstances and the ordinary and tolerable consequences of incarceration upon a family is somewhat shrouded in mystery and subject to intense speculation." Karen R. Smith, *United States v. Johnson: The Second Circuit Overcomes the Sentencing Guidelines' Myopic View of "Not Ordinarily Relevant" Family Responsibilities of the Criminal Offender,* 59 Brook. L.Rev. 573, 607 (1993).

12. It was not surprising then that the Supreme Court held that the discretion to depart from the Guidelines had to reside in the first instance in the trial court. Its normative judgment, after all, was framed by many, many cases, and the opportunity to look the defendant and his family in the eye. *See Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

PSRs—with appropriate protections—available to counsel.[13] The results were troubling. The legislative history of the provision authorizing the "family circumstances" guideline, suggests that Congress's goal was to discourage courts from considering family ties in order to keep them from departing upward in the case of disadvantaged defendants. Congress warned the Commission to "guard against the inappropriate use of incarceration for those defendants who lack education, employment and stabilizing ties." S.Rep. No. 98–225 at 175, *reprinted in* 1984 U.S.C.C.A.N. at 3358. *See also* Susan E. Ellingstad, *The Sentencing Guidelines: Downward Departures Based on a Defendant's Extraordinary Family Ties and Responsibilities*, 76 Minn. L.Rev. 957, 973 (1992).

Yet, it appears from my review of the records, that the situation Congress was concerned about has, to a degree, continued. Of the 48 cases in which downward departures were given, just over 60% were in white collar cases, largely involving defendants with advantaged backgrounds. By contrast, over the last five years, only 27% of the sentencings in this District were for white collar offenses.[14]

And those observations underscore the problems with the First Circuit's directive about the scope of comparison for determining departures—that any given defendant is to be compared to all defendants to determine if he is "typical" or "atypical" with respect to the trait being considered. The Court's holding in *Thompson II* is not consistent with the express language of the Sentencing Reform Act ("SRA"),[15] the Guidelines,[16] and the scholarly commen-

**13.** To identify defendants who had received a departure for extraordinary family circumstances between the years of 1992 and 2001 in the District of Massachusetts, I utilized databases kept by both the Probation Department and the Federal Defender Office that tracked whether any defendant had received a departure and the grounds for any such departure. I then independently reviewed the judgments and case files of every defendant to double check that these defendants had, in fact, received a departure for extraordinary family circumstances. After receiving this confirmation, I reviewed the PSRs of each of these defendants to better determine why my colleagues had decided to depart on this ground. I also provided counsel with redacted copies of the PSRs for their review. While it is possible that my data set was not one hundred percent comprehensive in identifying every defendant who received a downward departure based upon extraordinary family circumstances between 1992 and 2001, it does provide a significant sample set for comparison. There is no reason to believe that any additional, unidentified defendants would alter the troubling conclusions of my review.

**14.** Data provided by the Probation Department tracking sentencings in this District demonstrates this point. White collar offenses—including tax offenses, obstruction of justice, perjury, money laundering, gambling,

fraud, forgery, counterfeiting, and embezzlement—constituted 25.5% of 546 sentencings in calendar year 2001, 24.9% of 576 sentencings in 2000, 28.2% of 517 sentencings in 1999, 26.5% of 522 sentencings in 1998, and 31.3% of 454 sentencings in 1997. While this data does not extend all the way back to 1992, the beginning of my review of defendants who received family circumstances departures, there is no reason to believe that the percentage of defendants convicted of white collar offenses between 1992 and 1996 would be remarkably different from the percentage between 1997 and 2001.

**15.** The SRA authorized the United States Sentencing Commission to create sentencing guidelines that "provide certainty and fairness in meeting the purposes of sentencing, [thus] avoiding unwarranted sentencing disparities among defendants with similar records *who have been found guilty of similar criminal conduct.*" 28 U.S.C. § 991(b)(1)(B). (Emphasis supplied).

**16.** In the Introduction to the Guidelines, the Commission states that through the Guidelines, "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences *imposed for similar criminal offenses committed by similar offenders.*" U.S.S.G. § 1A3, p.s. (Emphasis supplied).

tary.[17]

Moreover, although *Thompson II* cites to earlier First Circuit precedent, *United States v. DeMasi*, 40 F.3d 1306 (1st Cir. 1994), that case never dealt with the express language of the SRA or the Guidelines. In *DeMasi*, the district court gave the defendant the benefit of a downward departure for his good works and community activities after comparing him, a well-heeled bank robber, to other bank robbers with fewer economic advantages. The First Circuit was rightfully concerned that economic situation had wrongly skewed the trial court's decision. But here, comparing a disadvantaged defendant to all defendants, including the most advantaged ones, has had precisely the opposite impact. The circumstances of Mr. Thompson's life that seem remarkable in context, that demonstrate extraordinary stability and responsibility relative to those similarly situated with respect to this offense, may not be so remarkable when compared to middle income or upper class offenders.

But while there are problems with either approach, the overwhelming weight of authority supports the approach of *Thompson I*. Congress focused only on "unwarranted disparity" between individuals who were similarly situated with respect to the offense of conviction, it made no effort to harmonize all sentences, to somehow rank all offenses in a single grid. Nor did the Commission.[18]

In any case, the issues that the Court was concerned about in *DeMasi* can be addressed under the Guidelines, even if Mr. Thompson is compared to those convicted of similar offenses. Because of the philanthropy made possible by his income, a departure may have been improper on other grounds—for example, under U.S.S.G. § 5H1.11 ("[m]ilitary, civic, charitable, or public service; employment-related contributions; and similar good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range")

■ Nevertheless, so long as *Thompson II* stands, I am obviously obliged to apply it. And even when I do, when I compare Mr. Thompson to all other defendants, he continues to stand out. The next question is whether he does so in the fashion and to the degree required by *United States v. Pereira*.

## 2. *Impact of Pereira*

In *Pereira*, the defendant pled guilty to subscribing false tax returns and using the mails for commercial bribery. The trial court found Pereira's offense level to be 16 but departed downward to a level 10,

17. Summarizing the structure of the Guidelines, one commentator stated: "Sentences were no longer to be indeterminate, but rather to treat *similarly situated defendants who commit identical offenses comparably.*" Michael Edmund O'Neil, *Abraham's Legacy: An Empirical Assessment of (Nearly) First–Time Offenders in the Federal System*, 42 B.C. L.Rev. 291, 301 (2001). (Emphasis supplied). Mr. O'Neil is a Commissioner on the Federal Sentencing Commission.

18. As I noted in *United States v. Lacy*, 99 F.Supp.2d 108, 112 (D.Mass.2000):
If I had credited the government's account that over fifty grams of cocaine base had been distributed in most of these cases, then I would have been obliged to assign an offense level of 32. This level yields a higher sentence for these defendants than it yields for those accused of, for example, transmitting top secret National Defense Information, level 29 (U.S.S.G. § 2M3.3); solicitation to commit murder, level 28 (U.S.S.G. § 2A1.5); assault with intent to commit murder, level 28 (U.S.S.G. § 2A2.1); criminal sexual abuse, level 27 (U.S.S.G. § 2A2.1); kidnaping, abduction and unlawful restraint, level 24 (U.S.S.G. § 2A4.1).

based on his extraordinary responsibilities for the care of his parents. The court sentenced Pereira to three years of probation with six months' home confinement. The First Circuit, concluding that the district court had erred, reversed the sentence and remanded the case. The Court first concluded that the defendant must show that the care he or she rendered was "irreplaceable" to qualify for this departure. *United States v. Pereira,* 272 F.3d 76, 82–83 (1st Cir.2001).[19] In an "errata" sheet, issued after the Court denied en banc review, the Court seemed to alter the standard to a showing of "irreplaceable or otherwise extraordinary." *Pereira,* 272 F.3d at 82 (citation to passage in amended opinion reflecting changes as ordered by "errata" sheet).

Many questions remain. Given the *Pereira* standard, even as amended, it would seem that the departure is only available to effect a sentence of probation. Once someone is in jail for a period of time, he has presumably already been "replaced." Cf. *United States v. Canoy,* 38 F.3d 893, 906 (7th Cir.1994).

Mr. Thompson has spent a number of years in prison under his original sentence. His children—and in particular his eldest daughter now seven—are suffering. But the family is coping. The extended family that embraced Mr. Thompson continues to stand by him and care for his children. Whatever the costs of their adjustment, and whatever their continuing pain, which

I do not mean to minimize, they cannot be characterized as "extraordinary" under the applicable First Circuit law.

C. *Should the defendant receive a downward departure on account of extraordinary post offense rehabilitation?*

■ In *Maldonado,* 242 F.3d at 5, the Court reaffirmed the appropriateness of a downward departure on re-sentencing because of "extraordinary circumstances reflecting rehabilitation after an earlier (now vacated) sentence for the same crime." Although the ground is no longer available to defendants,[20] all parties agree that it is available to Mr. Thompson because of the timing of his plea and sentencing.

In *United States v. Bradstreet,* 207 F.3d 76, 81–84 (1st Cir.2000), the Court found that a departure was permissible based on post-sentence rehabilitation if this rehabilitation is present to such an exceptional degree beyond the normal "rehabilitation" which is accounted for under the standard "acceptance of responsibility."

Between the first sentencing and the remand, Mr. Thompson was in jail. The opportunities for rehabilitation for a detained defendant are more limited than for one on bail pending appeal. Mr. Thompson could not demonstrate to me that he had resumed his life with his family and his union work, this time without drug dealing or other illegal activities. Moreover, while Mr. Thompson had problems

---

**19.** As I noted in *Lacarubba,* this was not an interpretation of the words of the Guidelines—as one would interpret the words of a statute. Nor was it an interpretation of the Guidelines' legislative history, or the legislative history of the relevant statutory reference in the SRA. Rather, the Court suggested that the standard was "nothing more than a distillation of existing judicial principles." *Pereira,* 272 F.3d at 82. The Court, however, "distilled" the law of those circuits whose views about family departures were more consonant

with the First Circuit's. In any event, as described above, the "errata" sheet to the decision modifies the "irreplaceable" standard.

**20.** The Commission has recently precluded departures based upon post-sentencing rehabilitative efforts. U.S.S.G. § 5K2.19 (Appendix X, amendment 602, effective November 1, 2000).

with drugs, they had not disabled him from functioning as a father or a worker. As a result, he could not show the kind of profound changes that addicts demonstrate when they "kick their habit" and begin to live responsible lives.

Rather, the building blocks of a responsible life were already in place before Mr. Thompson went to prison. As I found in *Thompson I*, long before his encounter with the criminal justice system, he was caring for his children and for his girlfriend's family. Long before the first sentencing, he showed his attachment to his church and his community.

What makes Mr. Thompson's record in prison extraordinary is that he has done virtually every single thing that it is possible to do in prison—every course, every program, every opportunity.[21] And he has done all of this while still seeing his children regularly, writing to them, sending money to his family, his church, and after the tragedy of September 11, 2001, even to the Red Cross. His girlfriend of over eight years and her family continue to support him. His commitment is unfailing. In a letter to the Court, he writes:

> I have read statistics that indicate 70% of black families in the United States do not have a father figure, and the mother is the head of the household. In my personal life, my father has been in jail for many years. I have known how important it is for children to have both a father and a mother. I do not want to be doomed to mistakes of the past, nor do I want my children to be doomed.

His record warrants departure on this ground. Accordingly, I depart downward to level 25 and sentence Mr. Thompson to 60 months.

SO ORDERED.

---

21. He has participated in the Ft. Devens drug abuse program, adult continuing education (including business development), preparation for commercial driver's license, parenting, health, nutrition, legal research, victim impact awareness, smoking cessation, exploratory computer applications, introduction to social psychology courses. He has received his General Equivalency Diploma. He has worked 20 hours per week and earns 12 cents per hour. He has consistently received good work evaluations. He attends church regularly.