# United States Court of Appeals
## For the First Circuit

No. 03-1550

UNITED STATES OF AMERICA,

Appellant,

v.

ANTONIO ROSELLI,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lipez, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

S. Robert Lyons, Attorney, Tax Division, U.S. Department of Justice, with whom Eileen J. O'Connor, Assistant Attorney General, Robert E. Lindsay, and Alan Hechtkopf, Attorneys, Tax Division, U.S. Department of Justice, were on brief, for appellant.

Richard M. Egbert, with whom Patricia M. DeJuneas was on brief, for appellee.

May 5, 2004

**LIPEZ, <u>Circuit Judge</u>**. Defendant Antonio Roselli pleaded guilty to tax fraud. At sentencing, the district court declined to determine the exact amount of the tax loss, and the offense level that would result from such a determination, ruling that such a finding would not affect the sentence. The court then departed downward from the Sentencing Guidelines based on Roselli's extraordinary family circumstances. The Government now appeals both the failure to specify an amount of tax loss and the decision to depart. Although we agree that the failure to specify an amount of tax loss and the related offense level was an error, we find that error harmless, and we affirm.[1]

## I.

In 1989, Antonio Roselli began working as a partner in an accounting firm where he provided tax services. In 1997 and 1998, Roselli prepared tax returns on behalf of his clients that included false deductions for charitable contributions and business expenses. He charged his clients approximately $250 for each false return. Roselli also amended tax returns from prior years, adding

_____

[1]Prior to oral argument, the district court granted appellee's motion to supplement the appellate record with the probation officer's confidential sentencing recommendation. In granting the motion, the district court explained that it does not normally consult such confidential recommendations when making sentencing decisions, and did not consult the recommendation in this case. One member of this panel has reviewed the probation officer's sentencing recommendation. However, that recommendation has not been discussed among the panel members, and it has not been considered in the decision of the panel.

false deductions in an effort to procure retroactive refunds.  For each amended return he charged approximately one third of the expected refund.  The Government contends that, all told, Roselli prepared more than 140 false tax returns, accounting for $101,524 in tax loss to the United States Treasury.

On August 29, 2002, Roselli pleaded guilty to one count of conspiracy to aid, assist, and abet in the filing of materially false tax returns in violation of 26 U.S.C. § 7206(2).  In the plea agreement, the Government stated its belief that the tax loss was $101,524, indicating a base offense level of 14 pursuant to section 2T1.4 of the Sentencing Guidelines.[2]  The Government argued that the appropriate total offense level, after several adjustments, was 13.[3]  The Government agreed to recommend a sentence of twelve

---

[2]All references to the Sentencing Guidelines are to the 1998 edition, which was in place at the time Roselli committed his most recent offense.  Normally, we apply the edition in effect at the time of sentencing.  See United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990)("Barring any *ex post facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing.").  However, § 2T4.1 provides for lower offense levels in the 1998 guidelines than it does in the current edition.  "Because imposition of the amended guidelines would have resulted in a higher BOL, and thus raised *ex post facto* concerns," we apply the 1998 Sentencing Guidelines.  Harotunian, 920 F.2d at 1042.

[3]The Government reached this calculation as follows: (1) an offense level of 14 for a tax loss greater than $70,000 but less than $120,000 pursuant to U.S.S.G. § 2T4.1; (2) a two level increase, pursuant to U.S.S.G. § 2T1.4(b)(1)(B), because Roselli was in the business of preparing tax returns; (3) a three level decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 (Section 3(e) of the plea agreement stipulated that the

months incarceration, a $20,000 fine, a $100 special assessment, and three years of supervised release.  Roselli asserted that the tax loss was not readily ascertainable and, in any event, was far less than $101,524.  Although he asserted that the proper total offense level was 10, he nevertheless agreed to recommend the same sentence as the prosecution, except that he would seek home detention for the twelve month period rather than incarceration.[4]

At the sentencing hearings, Roselli asserted that the tax loss was between $8,000 and $10,000.  He offered several examples, though not an exhaustive list, of tax returns that he alleged should not have been included in the government's loss calculation.  These examples amounted to an alleged overstatement of $52,525, bringing the tax loss down to no more than $48,999.  Nevertheless, Roselli reiterated that he would accept the Government's

Government would recommend a three level decrease if the court finds the adjusted offense level to be 16 or greater, and would recommend a two level decrease otherwise).  This total offense level of 13, with a criminal history category of I--which is undisputed in this case--corresponds to a guideline range of 12-16 months in Zone D.

[4]Roselli reached his calculation as follows: (1) an offense level of 10 for a tax loss greater than $8,000 but less than $13,500, pursuant to U.S.S.G. § 2T4.1;  (2) a two level increase, pursuant to U.S.S.G. § 2T1.4(b)(1)(B), because Roselli was in the business of preparing tax returns; (3) a two level decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.  The resulting total offense level of 10, with a criminal history category of I, corresponds to a guideline range of 6-12 months in Zone B.  Pursuant to U.S.S.G. § 5C1.1(c)(3), the court could satisfy the 6-12 month range with a sentence of probation with a condition of home detention.

recommendation of a total offense level of 13 so long as the court did not make a finding that the tax loss was $10,000 or more. The Government argued that the court must make a specific finding as to the tax loss and calculate the offense level based on that finding.

During the sentencing hearing, Roselli's counsel explained that a tax loss finding could have harmful collateral consequences in a subsequent deportation proceeding. Although Roselli has lived in the United States for approximately 34 years, he is a citizen of the United Kingdom and may be subject to deportation if he is convicted of an "aggravated felony." 8 U.S.C. § 1227(a)(2)(A)(iii). The violation of 26 U.S.C. § 7206(2) is not specifically listed as an aggravated felony, but the definition of "aggravated felony" includes any offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i).[5] If the court made an explicit finding that the tax loss was greater than $10,000, such a finding might be preclusive in any subsequent deportation proceeding. See, e.g., Hammer v. INS, 195 F.3d 836, 840-41 (6th Cir. 1999) (findings made during a denaturalization proceeding have preclusive effect in a subsequent deportation proceeding). Roselli would then be

_____

[5]An alien may also be deported for an offense "described in section 7201 of Title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(ii). However, because Roselli pleaded guilty to violation of 26 U.S.C. § 7206(2) (assisting in filing a false return), this provision apparently would not apply.

subject to deportation if the court found that a violation of 26 U.S.C. § 7206(2) fit the parameters outlined in 8 U.S.C. § 1101(a)(43)(M)(i).

After receiving supplemental briefs on the issue of the tax loss finding, the court declined to determine whether the tax loss was $101,524 as suggested by the Government, between $8,000 and $10,000 as suggested by Roselli, or somewhere between those two figures. The court reasoned that if it accepted Roselli's assertion that the tax loss was between $8,000 and $10,000, the resulting total offense level would be 10, corresponding to a guideline range of 6 to 12 months and a fine of between $2,000 and $20,000. If the court accepted the Government's contention that the tax loss was $101,524, the total offense level would be 13, corresponding to a guideline range of 12 to 18 months and a fine of $3,000 to $30,000. Thus, there was a point of overlap in guideline ranges that corresponded precisely with the Government's sentencing recommendation: 12 months of incarceration and a fine of $3,000 to $20,000.[6] The court then stated its conclusion on the tax loss finding issue:

> I'm confronted with, I think, a realistic prospect that the tax loss could be disputed. And the process of resolving that dispute

---

[6]Imposition of supervised release and a special assessment are not tied to the sentencing range, and therefore the existence of an overlap does not affect these aspects of the sentence. See U.S.S.G. § 5D1.1; U.S.S.G. § 5E1.3.

would be not quite the equivalent of the trial itself, but would be a quite demanding claim upon the Court's resources. Here, I would have to, I think, hear from [a witness]. I'd have to examine a variety of different tax returns to determine the tax loss. And there seems to me to be no particular benefit to doing that when we're dealing with overlapping Guidelines. And, of course, it's particularly the case that the Government in its plea agreement has committed itself to making a recommendation at that point of overlap under the Guidelines.

Having determined that the appropriate Guidelines sentence corresponded to a point of overlap in the two guideline sentencing ranges suggested by the parties, the court ruled that a finding as to the exact amount of the tax loss would "not affect sentencing" and was therefore unnecessary. Fed. R. Crim. P. 32(i)(3)(B).[7] The court made only the general finding that the tax loss was "not less than $8,000."

The court then considered Roselli's request for a downward departure from the Guidelines sentence based on the harm that his incarceration would cause to his family. Because two of

---

[7]The court cited Fed. R. Crim. P. 32(c). However, after the amendments to the Federal Rules of Criminal Procedure effective December 1, 2002, the relevant language is now in Fed. R. Crim. P. 32(i)(3)(B). Rule 32(i) provides:

(3) Court Determinations. At sentencing, the court:
. . .
        (B) must--for any disputed portion of the presentence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing . . . .

his four children suffer from cystic fibrosis (CF)[8], and because his wife suffers from several illnesses, Roselli argued that his family members would suffer extraordinary harm if he were incarcerated and unable to care for them. To support this contention, he submitted letters from a doctor, two nurses, and a social worker familiar with his children's condition and the integral role of parental care in battling CF. He also submitted letters from his wife, Kara, his wife's doctor, and his mother-in-law outlining their daily home life, Kara's illnesses, and the inability of other friends and relatives to adequately replace the services and care that Roselli provides to both his wife and children. The Government offered no evidence to rebut Roselli's description of the facts. Rather, it argued that the evidence

---

[8]In a letter submitted to the district court, Dr. Henry Dorkin, Director of the Cystic Fibrosis Center at the Massachusetts General Hospital, describes cystic fibrosis as

> a chronic, incurable, progressive and terminal illness of genetic origin. The basic defect in cystic fibrosis leads to abnormalities in several organ systems of the body, most importantly the lungs and gastrointestinal tract. [CF patients] develop persistent and chronic lung infections as well as obstruction of the airways with thick, tenacious secretions. The effect on the lungs over time is to develop respiratory insufficiency, leading to eventual respiratory failure and death. In a similar fashion, the thickened secretions obstruct the gastrointestinal system, impairing nutrition and leading in some cases to growth failure.

offered by Roselli, even if true, did not meet the standard for a downward departure based on extraordinary family circumstances.

The district court disagreed, finding that Roselli was "irreplaceable" to his family. It granted a downward departure, stating:

> The focus, obviously, is on the family, not the offender. And it would understate to say that this family will be devastated in a way that is truly extraordinary. . . . The capacity for living that the children have depends upon, I think, Mr. Roselli's presence. It is exacerbated by the physical challenges that Mrs. Roselli faces. And I believe that, while discouraged, this ground of departure is meant to address this extraordinary family circumstance.

The court stated that it would "depart to a probationary sentence," but did not specify the extent of the departure, saying only that it would depart "whether [the total offense level] is a 10 or 13." The court then sentenced Roselli to a three year term of probation, 12 months to be served in home confinement, a $20,000 fine, and a special assessment of $100.[9]

The Government now appeals. It first argues that the district court was required to determine the tax loss amount and the related offense level. It then argues that the downward departure was unwarranted because Roselli failed to meet the

---

[9]Pursuant to U.S.S.G. § 5B1.2(a)(1), a term of probation shall be "at least one year but not more than five years if the offense level is **6** or greater."

standards necessary to justify a departure for family circumstances. We address these arguments in turn.

## II.

We review de novo the district court's conclusion that it was not required to determine the amount of tax loss and the related offense level. See, e.g., United States v. Mateo, 271 F.3d 11, 13 (1st Cir. 2001) ("[W]e scrutinize the district court's legal determinations (including its application of the sentencing guidelines) de novo . . . .").

A district court does not have to determine the exact offense level where such a determination would not affect the court's sentencing decision under the Guidelines. See United States v. Carrozza, 4 F.3d 70, 88 (1st Cir. 1993) ("To be sure, a district court has inherent power not to decide disputes that are immaterial or irrelevant to the ultimate sentence."); see also United States v. Concemi, 957 F.2d 942, 953 (1st Cir. 1992) (stating in dicta that any error resulting in a reduction of the offense level, but not moving the district court's sentence outside the relevant guideline range, would be harmless). Under certain circumstances, the choice between two potentially applicable offense levels does not affect a court's sentencing decision. "[A] sentencing court need not choose between two overlapping guideline ranges when the same sentence would have been imposed under either range." Carrozza, 4 F.3d at 88. See also United States v.

-10-

Bermingham, 855 F.2d 925, 931 (2nd Cir. 1988)("[D]isputes about applicable guidelines need not be resolved where the sentence falls within either of two arguably applicable guideline ranges and the same sentence would have been imposed under either guideline range."). However, "a court may not pick a particular sentence solely to avoid the necessity of determining the guideline sentencing range." United States v. Ortiz, 966 F.2d 707, 718 (1st Cir. 1992). Thus, if the district court settled on a sentence that happened to fall at the point of overlap in the two potential guideline ranges, it did not have to determine which offense level, and thus which guideline range, applied to Roselli.

Prior to considering Roselli's request for a departure, the district court adopted the Government's position that the appropriate sentence under the Guidelines was 12 months incarceration and a $20,000 fine. The court did not explicitly reach this sentence prior to considering whether there was an overlap in the sentencing ranges indicated by a total offense level of 10 and a total offense level of 13. Nevertheless, both the Government and Roselli suggested to the court that 12 months was the appropriate sentence under the Guidelines. Thus, it appears that the court settled on that sentence because of the parties' mutual suggestion, not because it fell at a point of overlap in the two potential sentencing ranges.

The Government nevertheless argues that the district court's refusal to make an exact tax loss finding was improperly motivated by the desire to prevent Roselli from facing deportation. See United States v. Maung, 320 F.3d 1305, 1307-10 (11th Cir. 2003) (holding that a district court may not depart solely to minimize the effects of a conviction on immigration proceedings). Although the record indicates that the court was aware of the potential collateral effects that a tax loss finding might have in a subsequent deportation proceeding, it explicitly stated that a tax loss finding would not affect its sentencing decision and would waste judicial resources with unnecessary and burdensome fact-finding. We reject the Government's challenge to the authenticity of the court's explanation. Moreover, the court was not required to spend its resources sorting through disputed facts merely because a tax loss finding might prove beneficial to the government in a subsequent deportation proceeding.

If the district court had ended its analysis after refusing to make the tax loss finding, and had sentenced Roselli to 12 months imprisonment and a $20,000 fine, our analysis on appeal would be complete. However, the district court's subsequent decision to depart from the sentencing ranges indicated by the Guidelines poses a potential problem appropriately noted by the Government. Because the district court did not make a tax loss finding, and thus did not determine Roselli's exact offense level,

it could not specify the degree of its departure. The Government contends that the court's failure to specify the degree of departure was erroneous.

We agree with the Government that, in most cases, a district court must determine the defendant's total offense level prior to departure so that it can specify the degree of departure. To determine the defendant's offense level, the district court must first undertake the largely mechanical process of applying the Guidelines to a variety of objective factors. In a tax fraud case, one of the objective factors necessary to determine the proper offense level will be the amount of tax loss. See U.S.S.G. § 2T4.1. The offense level contributes to the determination of a sentencing range, and a "court shall impose a sentence of the kind, and within the range, [indicated by the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). Thus, to carry out this analysis, a court must first determine the proper sentencing range under the Guidelines before it can determine whether that range is inappropriate because of factors the Commission did not adequately account for in establishing the Guidelines.

Although we agree with the Government that the district court erred in failing to make a tax loss finding, we find that the

-13-

error was harmless in this case. First, the error did not affect the sentence imposed by the district court. See Williams v. United States, 503 U.S. 193, 203 (1992) ("[O]nce the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes on the record as a whole that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed."). The district court explicitly stated that it would impose the same sentence "whether [the total offense level] is a 10 or 13," indicating its intention to depart to a probationary sentence regardless of the amount of the tax loss. There is no reason to remand the case so that the district court can make a factual determination that would have no effect on its sentencing decision.

While the failure to make a tax loss finding did not affect the court's sentencing decision, it did prevent the court from specifying the offense level and the degree of its departure. Pursuant to 18 U.S.C. § 3742(e)(3)(C), we are required to review whether the district court's "sentence departs to an unreasonable degree from the applicable guidelines range." See also United States v. Bogdan, 302 F.3d 12, 16 (1st Cir. 2002) (stating that review of a district court's decision to depart from the Guidelines includes a review of the extent of that departure). Ordinarily, we cannot perform this appellate function if the district court does

not specify the degree of departure. Requiring the court to determine the total offense level prior to a departure decision establishes a basis for the specification of a degree of departure. Thus, in most cases, the district court must make the findings necessary--including determining the offense level--to establish the degree of departure. Cf. United States v. Roberson, 872 F.2d 597, 608 (5th Cir. 1989) ("Whether the court incorrectly determined the recommended range is relevant to our review of a [departure because a] . . . sentence that exceeds the Guidelines may look reasonable when compared to one recommended range, but unreasonable when compared to another.").

This case, however, presents an unusual circumstance because the sentence imposed allows us to determine what the total offense level and the maximum degree of departure must have been, and hence we can review the departure decision. After departing, the court sentenced Roselli to 12 months of probation served under a condition of home detention. Combined with Roselli's criminal history category of I, an offense level of 10 indicates a sentencing range of 6-12 months of imprisonment, which falls with Zone B of the sentencing table. Pursuant to U.S.S.G. § 5C1.1(c)(3), if the sentencing range falls within Zone B the court may order the defendant to serve the required term as probation with a condition of home detention rather than as a term of imprisonment. Thus, Roselli's sentence after departure is

consistent with the maximum term allowed by an offense level of 10, served as probation with a condition of home detention pursuant to § 5C1.1(c)(3).

Roselli's sentence after departure is not consistent with an offense level of less than 10. An offense level of 9 indicates a sentencing range of only 4-10 months. Offense levels of less than 9 carry a maximum term of six months. Thus, Roselli's sentence of 12 months of home detention exceeds the sentencing guideline range authorized by any offense level below 10.

Similarly, Roselli's sentence after departure is not consistent with an offense level of greater than 10. The sentencing ranges indicated by offense levels of 11 or 12 fall into Zone C. Pursuant to U.S.S.G. § 5C1.1(d), a defendant whose offense level places him in Zone C must serve at least half of his term in prison.[10] Sentencing ranges indicated by offense levels of 13 or greater fall into Zone D. Defendants in Zone D, pursuant to U.S.S.G. § 5C1.1(f), must serve their entire term in prison. Roselli's sentence of 12 months of probation with the condition of home detention would not be available under any offense level that indicated a sentencing range in Zone C or D.

---

[10]The other half of the term may be served as supervised release with a condition of home detention or community confinement.

The district court imposed a sentence that is consistent only with an offense level of 10. We can therefore narrow our inquiry regarding the degree of departure. If the district court had decided the tax loss question, and had agreed with the Government's contention that the tax loss was equal to $101,524, it would have applied to Roselli a total offense level of 13. The Government did not argue, and there is no evidence in the record to suggest, that the tax loss was greater than $101,524. Therefore, the maximum offense level that the district court could have applied to Roselli was 13. Because the court departed to a sentence that is consistent only with an offense level of 10, the maximum level of departure in this case was three levels, from an offense level of 13 to an offense level of 10.

The Government correctly points out that, if the district court had made a finding as to the tax loss, it might have found that the correct tax loss figure was somewhere between $10,000 and $101,524. Thus, the court might have determined that the correct total offense level was 11 or 12, necessitating a departure of only 1 or 2 levels to achieve an offense level of 10. Indeed, if the district court had agreed with Roselli's contention that the tax loss was less than $10,000, it could have sentenced Roselli in

accordance with an offense level of 10 without making any departure.[11]

Under different circumstances, this uncertainty about the level of departure might prevent us from properly reviewing the extent of the departure and require us to remand the case to the district court. In this case, however, the district court imposed a sentence that is consistent only with an offense level of 10. We can therefore determine that the maximum degree of departure is three levels. Obviously, if the record justifies a three level downward departure for extraordinary family circumstances, it would also justify a lesser departure.[12] Therefore, we turn to the merits of the departure for extraordinary family circumstances.

---

[11]Notwithstanding the possible immigration consequences of certain tax loss findings, Roselli was arguably disadvantaged in this proceeding by the court's refusal to make a loss finding. If Roselli had prevailed in his view of the tax loss, a downward departure based on extraordinary family circumstances would have been unnecessary to reach a sentence of probation. As the court proceeded, however, Roselli was forced to argue for a rare and discouraged form of departure from the Guidelines.

[12]Contrary to the Government's assertion, our decision does not conflict with United States v. Carrozza, 4 F.3d 70 (1st Cir. 1993). In Carrozza, there was no point of overlap between the two possible sentencing ranges. Rather than determine which offense level, and therefore which sentencing range, was correct, the district court settled on a sentence between the two ranges. Thus, on appeal, we could not determine whether the court had departed upward or downward to reach the sentence it imposed. In this case, the district court determined that the proper sentence under the Guidelines was at a point of overlap in the two possible sentencing ranges, and we can determine that the maximum degree of downward departure was three levels. Thus, unlike Carrozza, we are able to adequately review the degree of departure.

We apply a three part analysis to review of departures: "(1) we determine whether the stated ground for departure is theoretically permissible under the guidelines; (2) if so, we examine the record to assess whether there is adequate factual support; and (3) we determine the appropriateness of the degree of departure." Bogdan, 302 F.3d at 16. We review part one of the test de novo. United States v. Bradstreet, 207 F.3d 76, 81 (1st Cir. 2000). Pursuant to the PROTECT Act, Pub. L. No. 108-21, 117 Stat. 650, we review part two of this test de novo for all appeals pending on or filed after April 30, 2003. See United States v. Thurston, 358 F.3d 51, 70-71 (1st Cir. 2004). The PROTECT Act did not alter our review of the extent of departures, and we therefore continue to review part three of the test only for abuse of discretion. Id. at 70-71; see also Koon v. United States, 518 U.S. 81, 96-97 (1996).

A court must impose a sentence within the range prescribed by the guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). To warrant a departure, a circumstance must "render the case atypical and take it out of the 'heartland' for which the applicable

guideline was designed." United States v. Carrion-Cruz, 92 F.3d 5, 6 (1st Cir. 1996). Among potential factors justifying a departure, a "discouraged factor" is one "'not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.'" United States v. Mejia, 309 F.3d 67, 70 (1st Cir. 2002)(quoting U.S.S.G. § 5, part H, intro. cmt.). "The Sentencing Guidelines deem family circumstances a 'discouraged' ground for departure, and a district court may depart on the basis of a discouraged ground only in an 'exceptional' case." United States v. Louis, 300 F.3d 78, 81-82 (1st Cir. 2002); see also U.S.S.G. § 5H1.6; United States v. Pereira, 272 F.3d 76, 80 (1st Cir. 2001).

We have affirmed departures for exceptional family circumstances only on rare occasions, noting that "time-consuming family responsibilities, by themselves, are not sufficient to take a case out of the 'heartland.'" Pereira, 272 F.3d at 80. In United States v. Carr, 932 F.2d 67, 72-73 (1st Cir. 1991), we reversed a downward departure based on family circumstances because, even though Carr and her husband both faced prison terms, their 4-year-old child could be cared for by Carr's mother during their incarceration. In United States v. Chestna, 962 F.2d 103 (1st Cir. 1992), we found that incarcerating a single mother of four young children (aged thirteen, eleven, four, and less than one) would not cause the exceptional family hardship required to

depart from the guidelines because "single mother status is not an idiosyncratic circumstance. . . ." Id. at 107 (internal quotation marks omitted). In Pereira, we vacated a departure based on the defendant's role in caring for his elderly parents because the defendant did not provide specialized care, his siblings were available to help with the parents' care, and home nursing services provided an adequate alternative during the period of the defendant's incarceration. 272 F.3d at 82-83. See also United States v. Sweeting, 213 F.3d 95, 104-05 (3rd Cir. 2000)(departure not appropriate for a single mother of five children, one of whom had Tourette Syndrome, where the care provided by the mother was to engage in daily exercise with the child, to help him keep his school and home tasks organized, to administer his medicine when necessary, and to remove certain foods from his diet).

Nevertheless, we have upheld departures in limited circumstances where a defendant was so irreplaceable that incarceration would cause exceptional hardship to his family. In United States v. Sclamo, 997 F.2d 970, 974 (1st Cir. 1993), we affirmed a departure where the defendant's stepson, who suffered from a psychiatric disorder and had a long history of aggressive and disruptive behavior, was making dramatic progress largely because of the support and care of the defendant. In that circumstance, the defendant's important role could not practically have been filled by any other person. In United States v. Rivera,

994 F.2d 942, 952-54 (1st Cir. 1993), we ruled that the district court might justifiably depart on remand where defendant was the single mother of three young children, received income only from welfare, and had virtually no contact with or support from other family members. This combination of factors might be enough, on a closer review of the facts, to render the defendant irreplaceable to her young children. See also United States v. Haversat, 22 F.3d 790, 797 (8th Cir. 1994)(upholding departure because defendant's wife suffered from a severe psychiatric disorder and defendant was needed to "identify the beginning of any regression and to seek out immediate treatment to avoid 'a serious situation.'").

A downward departure for extraordinary family circumstances may be appropriate where the care provided by the defendant is "irreplaceable or otherwise extraordinary." Pereira, 272 F.3d at 82. This standard requires the district court to determine whether "there are *feasible* alternatives of care that are relatively comparable to what the defendant provides." Id. (emphasis added). Thus, a downward departure is appropriate if the defendant's role "is so different in kind or degree from the many kinds of support that can be important in the [family] relationship that it makes the family ties and responsibilities factor . . . exceptional." Louis, 300 F.3d at 82.

This case presents an exceptional situation. Roselli has four children, each of whom is under the age of 10. Two of the

-22-

children--Antonio, age 9, and Adyn, age 1--suffer from CF. Caring for Antonio and Adyn requires extensive time and effort by both Roselli and his wife, Kara. Antonio must visit his pulmonary doctor at least six times per year and has been hospitalized three times in the past four years. After each hospitalization, Antonio's parents must administer intravenous antibiotics three times a day--with each session lasting approximately one hour--for three weeks. Antonio requires a special diet which must be prepared separately from the other children's meals. Each morning and evening, Antonio must undergo 30 minutes of closely monitored treatment to combat bacteria that causes deterioration of the lungs. The parents also administer several other prescription medications each morning, taking approximately 20 minutes, and monitor Antonio's chest therapy for 30 to 40 minutes each evening. Finally, Roselli helps Antonio with his studies and ensures that he maintains the level of physical activity prescribed by his doctors by jogging with him, coaching his baseball and football teams, and transporting him to gymnastics and soccer practice.

Caring for Adyn requires even more attention and effort. In addition to CF, Adyn suffers from gastroesophageal reflux disease (GERD), which makes it extremely difficult for him to consume and digest food. Doctors have installed a feeding tube to ensure that he gets the nourishment he needs to battle his CF. Roselli and his wife give Adyn three meals a day via "bolus

feeding," a process whereby Adyn receives formula through a test-tube like apparatus attached to his feeding tube. This process requires both parents: Kara conducts the feeding while Roselli holds Adyn upright to minimize the chance of vomiting or choking. Each feeding lasts approximately 45 minutes, requiring significant strength and endurance to keep Adyn in an upright position. Roselli has developed a work schedule that allows him to be home during the morning and to be present for most of Adyn's bolus feedings. At night, Adyn's feeding tube is attached to a food pump, which provides both nourishment and most of his medication, for eight to ten hours. Because Adyn must tolerate this method of feeding while lying on his back, Roselli and his wife must check the feeding tube intermittently throughout the night to ensure that Adyn does not choke or vomit. Both parents are trained to reinsert the feeding tube if it should accidentally be dislodged. If the tube is not reinserted within an hour after coming loose, Adyn would require surgery. Roselli also administers several medications to Adyn each morning and cleans his feeding tube daily to prevent infections.

Comparable alternatives to Roselli's care are, for practical purposes, nonexistent. Kara cannot care for the children herself, largely because of her own health problems. She suffers from fibromyalgia, a chronic condition that causes pain in the soft tissue and joints throughout her body. The effects can be so

debilitating that they prevent her from completing simple physical tasks. Other symptoms of her condition include severe fatigue, irritable bowel syndrome, numbness in her hands and feet, difficulty sleeping and concentrating, memory lapses, and feeling overwhelmed when faced with multiple tasks. She also suffers from chronic migraine headaches, for which she has sought emergency room treatment on several occasions. Finally, Kara has been diagnosed with depression and anxiety. She takes a variety of medications to control each of these illnesses.

Roselli's relatives are unable to provide adequate assistance. Kara's mother lives more than one hour away and cares for two terminally ill sons, as well as her husband who suffers from prostate cancer. Roselli's mother is 74 years old and has difficulty walking because of her arthritis. Roselli's sister is the only other family member who lives in Massachusetts, and she cares for three children of her own.

In-home health care also does not provide a viable alternative to Roselli's presence. To replace the care that Roselli provides, the family would have to hire a nurse--or likely several nurses working in shifts--on a 24 hour-a-day, seven days-a-week basis. They would have to be trained to provide the special care that Adyn requires, including bolus feeding and the overnight feeding system. Even in the event that such care were available

and not prohibitively expensive, it would not fulfill Roselli's role in Antonio's exercise regimen and schoolwork.

Finally, emotional support is an important factor under these circumstances. The letter from CF specialist Dr. Dorkin states that "[h]aving one child with CF can be overwhelming for many families. To have two such children can be devastating. . . . Only the ability to have [Mr. Roselli] share in the care of the children has kept the children out of the hospital." He further states that removal of their father from the home "will contribute to a more rapid course in [the children's] deterioration." A letter from Kara's doctor states that "I have no doubt that if [Roselli] is removed from the home and Kara is left with sole responsibility for caring for her children, Kara's stress and activity levels would be substantially increased, in turn leading to an overall decline in her own health as well as her ability to care for her children." While doubtless the incarceration of a parent can in many ordinary cases have an unfortunate emotional effect on other family members, this case is exceptional in that, besides the emotional impact upon remaining family members, the removal of Roselli's critical services from his home will impact severely upon the physical well-being and even the ability to survive of those left behind.

In Rivera, we wrote that "at some point, the nature and magnitude of family responsibilities (many children? with

-26-

handicaps? no money? no place for children to go?) may transform the 'ordinary' case . . . into a case that is not at all ordinary." 994 F.2d at 948. Roselli's family circumstances move this case well outside the ordinary range. Under these circumstances, where two children require specialized round-the-clock care because of CF, where adequate help is not readily available, and where the other parent is battling her own debilitating health problems, a three level downward departure for extraordinary family circumstances is entirely appropriate. The judgment of the district court is **AFFIRMED**.

So ordered.